# UNITED STATES *v.* MUNOZ-FLORES

No. 88–1932.   Argued February 20, 1990—Decided May 21, 1990

386

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, BLACKMUN, and KENNEDY, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which O'CONNOR, J., joined, *post*, p. 401. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 408.

*Deputy Solicitor General Bryson* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Dennis*, and *Clifford M. Sloan*.

*Judy Clarke* argued the cause for respondent. With her on the brief was *Mario G. Conte*.

JUSTICE MARSHALL delivered the opinion of the Court.

This case raises the question whether 18 U. S. C. § 3013, which requires courts to impose a monetary "special assessment" on any person convicted of a federal misdemeanor, was passed in violation of the Origination Clause of the Constitution. That Clause mandates that "[a]ll Bills for raising Revenue shall originate in the House of Representatives." U. S. Const., Art. I, § 7, cl. 1. We conclude initially that this case does not present a political question and therefore reject the Government's argument that the case is not justiciable. On the merits, we hold that the special assessment statute does

not violate the Origination Clause because it is not a "Bil[l] for raising Revenue."

## I

In June 1985, German Munoz-Flores was charged with aiding the illegal entry of aliens into the United States. He subsequently pleaded guilty to two misdemeanor counts of aiding and abetting aliens to elude examination and inspection by immigration officers. The Magistrate sentenced respondent to probation and ordered him to pay a special assessment of $25 on each count under the then-applicable version of 18 U. S. C. § 3013 (1982 ed., Supp. V). Pet. for Cert. 27a–28a.

Respondent moved to correct his sentence, asserting that the special assessments were unconstitutional because Congress had passed § 3013 in violation of the Origination Clause. The Magistrate denied the motion, and the District Court affirmed. Id., at 26a. On appeal, the Ninth Circuit vacated the portion of the District Court's sentencing order that imposed the special assessments. 863 F. 2d 654 (1988). The court held that respondent's claim did not raise a nonjusticiable political question. Id., at 656–657. On the merits, the court ruled that § 3013 was a "Bil[l] for raising Revenue," id., at 657–660, and that it had originated in the Senate because that Chamber was the first to pass an assessment provision, id., at 660–661. The court therefore concluded that § 3013 had been passed in violation of the Origination Clause. Id., at 661.

The United States petitioned for a writ of certiorari, arguing that § 3013 did not violate the Origination Clause.[1] The

---

[1] The Ninth Circuit's ruling that § 3013 was passed in violation of the Origination Clause is inconsistent with the holdings of the other six Courts of Appeals that have considered the issue. See *United States* v. *Griffin*, 884 F. 2d 655, 656–657 (CA2 1989) (§ 3013 not a "Bil[l] for raising Revenue"); *United States* v. *Simpson*, 885 F. 2d 36, 40 (CA3 1989) (same); *United States* v. *Herrada*, 887 F. 2d 524, 527 (CA5 1989) (same); *United States* v. *Ashburn*, 884 F. 2d 901, 903 (CA6 1989) (same); *United States* v.

Government noted that the Ninth Circuit had rejected its argument that the case raised a political question, Pet. for Cert. 5, n. 5, but did not ask this Court to review that ruling. We granted certiorari and directed the parties to brief the political question issue. 493 U. S. 808 (1989).[2]

## II

### A

In *Baker* v. *Carr*, 369 U. S. 186, 217 (1962), this Court identified the features that characterize a case raising a nonjusticiable political question:

> "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibil-

*Tholl*, 895 F. 2d 1178, 1181–1182 (CA7 1990) (same); *United States* v. *King*, 891 F. 2d 780, 782 (CA10 1989) (same).

[2] This Court has reserved the question whether "there is judicial power after an act of Congress has been duly promulgated to inquire in which House it originated." *Rainey* v. *United States*, 232 U. S. 310, 317 (1914). The Court has, however, resolved an Origination Clause claim without suggesting that the claim might be nonjusticiable. *Millard* v. *Roberts*, 202 U. S. 429, 436–437 (1906).

No Court of Appeals has held that an Origination Clause challenge to § 3013 raises a political question. The Ninth Circuit in this case rejected the claim that the issue raises a political question, 863 F. 2d 654, 656–657 (1988), and the Third Circuit has reached the same conclusion, *Simpson*, *supra*, at 38–39. Three Circuits have addressed the merits of an Origination Clause claim without mentioning the political question doctrine, *Griffin*, *supra*; *Ashburn*, *supra*; *King*, *supra*; and two Circuits have refused to decide whether the issue raises a political question, *Herrada*, *supra*, at 525, and n. 1; *Tholl*, *supra*, at 1181–1182, n. 7. But cf. *Texas Assn. of Concerned Taxpayers, Inc.* v. *United States*, 772 F. 2d 163 (CA5 1985) (holding that an Origination Clause challenge to the Tax Equity and Fiscal Responsibility Act of 1982, 96 Stat. 324, presented a nonjusticiable political question).

ity of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

Accord, *INS* v. *Chadha*, 462 U. S. 919, 941 (1983) (quoting *Baker, supra,* at 217).

The United States contends that "[t]he most persuasive factor suggesting nonjusticiability" is the concern that courts not express a "lack of . . . respect" for the House of Representatives. Brief for United States 10.[3] In the Government's view, the House's passage of a bill conclusively establishes that the House has determined either that the bill is not a revenue bill or that it originated in the House. Hence, the Government argues, a court's invalidation of a law on Origination Clause grounds would evince a lack of respect for the House's determination. The Government may be right that a judicial finding that Congress has passed an unconstitutional law might in some sense be said to entail a "lack of respect" for Congress' judgment. But disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question. If it were, *every* judicial resolution of a constitutional challenge to a congressional enactment would be impermissible. Congress often explicitly considers

---

[3] The Government does not argue that *all* of the factors enunciated in *Baker* v. *Carr,* 369 U. S. 186, 217 (1962), suggest that this case raises a political question. The Government concedes that no provision of the Constitution demonstrably commits to the House of Representatives the determination of where a bill originated. Brief for United States 9. Moreover, the Government does not suggest that answering the origination question requires any sort of "initial policy determination" that courts ought not make or that the question presents an "unusual need for unquestioning adherence to a political decision already made." Nor does it suggest that there is any more danger of "multifarious pronouncements" in this context than in any other in which a court determines the constitutionality of a federal law. *Baker* v. *Carr, supra,* at 217.

whether bills violate constitutional provisions. See, *e. g.*, 135 Cong. Rec. 23121–23122 (1989) (remarks of Sen. Biden) (expressing the view that the Flag Protection Act of 1989, 103 Stat. 777, does not violate the First Amendment); 133 Cong. Rec. 30498–30499 (1987) (remarks of Sen. Hatch) (arguing that the independent counsel law, 28 U. S. C. § 591 *et seq.*, was unconstitutional). Because Congress is bound by the Constitution, its enactment of any law is predicated at least implicitly on a judgment that the law is constitutional. Indeed, one could argue that Congress explicitly determined that this bill originated in the House because it sent the bill to the President with an "H. J. Res." designation. See *post*, at 409 (SCALIA, J., concurring in judgment). Yet such congressional consideration of constitutional questions does not foreclose subsequent judicial scrutiny of the law's constitutionality. On the contrary, this Court has the duty to review the constitutionality of congressional enactments. As we have said in rejecting a claim identical to the one the Government makes here: "Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Powell* v. *McCormack*, 395 U. S. 486, 549 (1969).[4]

---

[4] JUSTICE SCALIA apparently would revisit *Powell.* He contends that Congress' resolution of the constitutional question in passing the bill bars this Court from independently considering that question. The only case he cites for his argument is *Marshall Field & Co.* v. *Clark*, 143 U. S. 649 (1892). But *Field* does not support his argument. That case concerned "the nature of the evidence" the Court would consider in determining whether a bill had actually passed Congress. *Id.*, at 670. Appellants had argued that the constitutional Clause providing that "[e]ach House shall keep a Journal of its Proceedings" implied that whether a bill had passed must be determined by an examination of the journals. See *ibid.* (quoting Art. I, § 5) (internal quotation marks omitted). The Court rejected that interpretation of the Journal Clause, holding that the Constitution left it to

The United States seeks to differentiate an Origination Clause claim from other constitutional challenges in two ways. The Government first argues that the House has the power to protect its institutional interests by refusing to pass a bill if it believes that the Origination Clause has been violated. Second, the Government maintains that the courts should not review Origination Clause challenges because compliance with that provision does not significantly affect individual rights. Of course, neither the House's power to protect itself nor the asserted lack of a connection between the constitutional claim and individual rights is a factor that *Baker* identifies as characteristic of cases raising political questions. Rather, the Government attempts to use its arguments to establish that judicial resolution of Origination Clause challenges would entail a substantial lack of respect for the House, a factor that *Baker does* identify as relevant to the political question determination. Neither of the Government's arguments persuades us.

Although the House certainly can refuse to pass a bill because it violates the Origination Clause, that ability does not absolve this Court of its responsibility to consider constitutional challenges to congressional enactments. See *supra*, at 391. Nor do the House's incentives to safeguard its origination prerogative obviate the need for judicial review. As an initial matter, we are unwilling to presume that the House has a greater incentive to safeguard its origination power than it does to refuse to pass a bill that it believes is unconstitutional for other reasons. Such a presumption would demonstrate a profound lack of respect for a coordinate branch of Government's pledge to uphold the *entire* Constitu-

Congress to determine how a bill is to be authenticated as having passed. *Id.*, at 670–671. In the absence of any constitutional requirement binding Congress, we stated that "[t]he respect due to coequal and independent departments" demands that the courts accept as passed all bills authenticated in the manner provided by Congress. *Id.*, at 672. Where, as here, a constitutional provision *is* implicated, *Field* does not apply.

tion, not just those provisions that protect its institutional prerogatives.

Even if we were to assume that the House does have more powerful incentives to refuse to pass legislation that violates the Origination Clause, that assumption would not justify the Government's conclusion that the Judiciary has no role to play in Origination Clause challenges. In many cases involving claimed separation-of-powers violations, the branch whose power has allegedly been appropriated has both the incentive to protect its prerogatives and institututional mechanisms to help it do so. Nevertheless, the Court adjudicates those separation-of-powers claims, often without suggesting that they might raise political questions. See, *e. g.*, *Mistretta* v. *United States*, 488 U. S. 361, 371–379 (1989) (holding that Sentencing Reform Act of 1984, 18 U. S. C. § 3551 *et seq.*, and 28 U. S. C. § 991 *et seq.*, did not result in Executive's wielding legislative powers, despite either House's power to block Act's passage); *Morrison* v. *Olson*, 487 U. S. 654, 685–696 (1988) (holding that independent counsel provision of Ethics in Government Act of 1978, 28 U. S. C. § 591 *et seq.*, is not a congressional or judicial usurpation of executive functions, despite President's veto power); *INS* v. *Chadha*, 462 U. S. 919 (1983) (explicitly finding that separation-of-powers challenge to legislative veto presented no political question). In short, the fact that one institution of Government has mechanisms available to guard against incursions into its power by other governmental institutions does not require that the Judiciary remove itself from the controversy by labeling the issue a political question.

The Government's second suggestion—that judicial intervention in this case is unwarranted because the case does not involve individual rights—reduces to the claim that a person suing in his individual capacity has no direct interest in our constitutional system of separation of powers, and thus has no corresponding right to demand that the Judiciary ensure the integrity of that system. This argument is simply irrele-

vant to the political question doctrine. That doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government; the identity of the *litigant* is immaterial to the presence of these concerns in a particular case. And we are unable to discern how, from the perspective of interbranch relations, the asserted lack of connection between Origination Clause claims and individual rights means that adjudication of such claims would necessarily entail less respect for the House than would judicial consideration of challenges based on constitutional provisions more obviously tied to civil liberties.

Furthermore, and more fundamentally, the Government's claim that compliance with the Origination Clause is irrelevant to ensuring individual rights is in error. This Court has repeatedly emphasized that "'the Constitution diffuses power the better to secure liberty.'" *Morrison, supra,* at 694 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952) (Jackson, J., concurring)). See also *Morrison, supra,* at 697 (SCALIA, J., dissenting) ("The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government"). Recognizing this, the Court has repeatedly adjudicated separation-of-powers claims brought by people acting in their individual capacities. See, *e. g., Mistretta, supra* (adjudicating claim that United States Sentencing Commission violates separation of powers on direct appeal by an individual defendant who had been sentenced pursuant to guidelines created by the Commission).

What the Court has said of the allocation of powers *among* branches is no less true of such allocations *within* the Legislative Branch. See, *e. g., Chadha, supra,* at 948–951 (bicameral National Legislature essential to protect liberty); The Federalist No. 63 (defending bicameral Congress on ground that each House will keep the other in check). The Constitution allocates different powers and responsibilities to the House and Senate. Compare, *e. g.,* U. S. Const., Art. II,

§ 2, cl. 2 (giving Senate "Advice and Consent" power over treaties and appointment of ambassadors, judges, and other officers of the United States), with Art. I, § 7, cl. 1 (stating that "[a]ll Bills for raising Revenue shall originate in the House of Representatives"). The authors of the Constitution divided such functions between the two Houses based in part on their perceptions of the differing characteristics of the entities. See The Federalist No. 58 (defending the decision to give the origination power to the House on the ground that the Chamber that is more accountable to the people should have the primary role in raising revenue); The Federalist No. 64 (justifying advice and consent function of the Senate on the ground that representatives with longer terms would better serve complex national goals). At base, though, the Framers' purpose was to protect individual rights. As James Madison said in defense of that Clause: "This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." The Federalist No. 58, p. 359 (C. Rossiter ed. 1961). Provisions for the separation of powers within the Legislative Branch are thus *not* different in kind from provisions concerning relations between the branches; both sets of provisions safeguard liberty.

The Government also suggests that a second *Baker* factor justifies our finding that this case is nonjusticiable: The Court could not fashion "judicially manageable standards" for determining either whether a bill is "for raising Revenue" or where a bill "originates." We do not agree. The Government concedes, as it must, that the "general nature of the inquiry, which involves the analysis of statutes and legislative materials, is one that is familiar to the courts and often central to the judicial function." Brief for United States 9. To be sure, the courts must develop standards for making the revenue and origination determinations, but the Government

suggests no reason that developing such standards will be more difficult in this context than in any other. Surely a judicial system capable of determining when punishment is "cruel and unusual," when bail is "[e]xcessive," when searches are "unreasonable," and when congressional action is "necessary and proper" for executing an enumerated power is capable of making the more prosaic judgments demanded by adjudication of Origination Clause challenges.

In short, this case has none of the characteristics that *Baker* v. *Carr* identified as essential to a finding that a case raises a political question. It is therefore justiciable.

## B

Although JUSTICE STEVENS agrees with the Government that this Court should not entertain Origination Clause challenges, he relies on a novel theory that the Government does not advance. He notes that the Constitution is silent as to the consequences of a violation of the Origination Clause, but that it provides by implication that any bill that passes both Houses and is signed by the President becomes a law. See Art. I, § 7, cl. 2; *post*, at 401–403, and n. 1. From this JUSTICE STEVENS infers the proposition that "some bills may become law even if they are improperly originated." *Post*, at 403.

We cannot agree with JUSTICE STEVENS' approach. The better reading of § 7 gives effect to *all* of its Clauses in determining what procedures the Legislative and Executive Branches must follow to enact a law. In the case of "Bills for raising Revenue," § 7 requires that they originate in the House before they can be properly passed by the two Houses and presented to the President. The Origination Clause is no less a requirement than the rest of the section because "it does not specify what consequences follow from an improper origination," *post*, at 402. None of the Constitution's commands explicitly sets out a remedy for its violation. Nevertheless, the principle that the courts will strike down a law when Congress has passed it in violation of such a command

has been well settled for almost two centuries. See, *e. g.*, *Marbury* v. *Madison*, 1 Cranch 137, 176–180 (1803). That principle applies whether or not the constitutional provision expressly describes the effects that follow from its violation.

Even were we to accept JUSTICE STEVENS' contrary view—that § 7 provides that a bill becomes a "law" even if it is improperly originated—we would not agree with his conclusion that no remedy is available for a violation of the Origination Clause. Rather, the logical consequence of his view is that the Origination Clause would most appropriately be treated as a constitutional requirement separate from the provisions of § 7 that govern when a bill becomes a "law." Of course, saying that a bill becomes a "law" within the meaning of the second Clause does not answer the question whether that "law" is *constitutional*. To survive this Court's scrutiny, the "law" must comply with all relevant constitutional limits. A law passed in violation of the Origination Clause would thus be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment.[5]

### III

Both parties agree that "revenue bills are those that levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue." *Twin City Bank* v. *Nebeker*, 167 U. S. 196, 202 (1897) (citing 1 J. Story, Commentaries on the Constitution § 880, pp. 610–611 (3d ed. 1858)). The Court has interpreted this

---

[5] In an attempt to resurrect in another guise an argument that we have rejected, see *supra*, at 392–394, JUSTICE STEVENS seeks to differentiate the Origination Clause from such other constitutional provisions by suggesting that the House would more effectively ensure compliance with the Clause than would this Court. *Post*, at 403–406. Yet he apparently concedes that this case is justiciable despite his argument that the House is a better forum than the Judiciary for the resolution of Origination Clause disputes. The reasoning does not become persuasive merely because it is used for a different purpose, and we continue to reject it.

general rule to mean that a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a "Bil[l] for raising Revenue" within the meaning of the Origination Clause. For example, the Court in *Nebeker* rejected an Origination Clause challenge to what the statute denominated a "tax" on the circulating notes of banking associations. Despite its label, "[t]he tax was a means for effectually accomplishing the great object of giving to the people a currency . . . . There was no purpose by the act or by any of its provisions to raise revenue to be applied in meeting the expenses or obligations of the Government." *Nebeker, supra,* at 203. The Court reiterated the point in *Millard* v. *Roberts,* 202 U. S. 429 (1906), where it upheld a statute that levied property taxes in the District of Columbia to support railroad projects. The Court rejected an Origination Clause claim, concluding that "[w]hatever taxes are imposed are but means to the purposes provided by the act." *Id.,* at 437.

This case falls squarely within the holdings in *Nebeker* and *Millard.* The Victims of Crime Act of 1984 established a Crime Victims Fund, 98 Stat. 2170, 42 U. S. C. § 10601(a) (1982 ed., Supp. II), as a federal source of funds for programs that compensate and assist crime victims. See § 10601(d) (allocating moneys among programs); § 10602 (delineating eligible compensation programs); § 10603 (delineating eligible assistance programs). The scheme established by the Act includes various mechanisms to provide money for the Fund, including the simultaneously enacted special assessment provision at issue in this case. § 10601(b)(2). Congress also specified, however, that if the total income to the Fund from all sources exceeded $100 million in any one year, the excess would be deposited in the general fund of the Treasury. § 10601(c)(1).[6] Although nothing in the text or the legislative

---

[6] The statute has since been amended to provide a cap of $125 million through fiscal year 1991. 102 Stat. 4419, 42 U. S. C. § 10601(c)(1)(B)(i).

history of the statute explicitly indicates whether Congress expected that the $100 million cap would ever be exceeded, in fact it never was. The Government reports that the first and only excess occurred in fiscal year 1989, when the cap stood at $125 million and receipts were between $133 million and $134 million, Brief for United States 21, n. 21, a claim respondent does not dispute, Brief for Respondent 19, n. 16.

Moreover, only a small percentage of any excess paid into the General Treasury can be attributed to the special assessments. The legislative history of the special assessment provision indicates that Congress anticipated that "substantial amounts [would] not result" from that source of funds. S. Rep. No. 98–497, p. 13 (1984). Reality has accorded with Congress' prediction. See U. S. Dept. of Justice, Office for Victims of Crime, Office of Justice Programs, Victims of Crime Act of 1984: A Report to Congress by the Attorney General 12 (1988) (§ 3013 revenues accounted for four percent of all deposits into the Fund received by United States Attorneys' Offices for fiscal year 1987). Four percent of a minimal and infrequent excess over the statutory cap is properly considered "incidenta[l]."

As in *Nebeker* and *Millard*, then, the special assessment provision was passed as part of a particular program to provide money for that program—the Crime Victims Fund. Although any excess was to go to the Treasury, there is no evidence that Congress contemplated the possibility of a substantial excess, nor did such an excess in fact materialize. Any revenue for the general Treasury that § 3013 creates is thus "incidenta[l]" to that provision's primary purpose. This conclusion is reinforced, not undermined, by the Senate Report that respondent claims establishes that § 3013 is a "Bil[l] for raising Revenue." That Report reads: "The purpose of

---

The amendment also provides that the Judicial Branch will receive the first $2.2 million of excess collections to cover the costs of assessing and collecting criminal fines. § 10601(c)(1)(A). After fiscal year 1991, the cap will be $150 million through fiscal year 1994. § 10601(c)(1)(B)(ii).

imposing nominal assessment fees is to generate needed income to offset the cost of the [Crime Victims Fund]. Although substantial amounts will not result, these additional amounts will be helpful in financing the program *and will constitute new income for the Federal government.*" S. Rep. No. 98–497, *supra*, at 13–14 (emphasis added). Respondent's reliance on the emphasized portion of the quoted passage avails him nothing. Read in its entirety, the passage clearly evidences Congress' intent that § 3013 provide funds primarily to support the Crime Victims Fund.

Respondent next contends that even if § 3013 is directed entirely to providing support for the Crime Victims Fund, it still does not fall within the ambit of *Nebeker* or *Millard.* Respondent accurately notes that the § 3013 assessments are not collected for the benefit of the payors, those convicted of federal crimes. He then contends, citing *Nebeker* and *Millard,* that any bill that provides for the collection of funds is a revenue bill unless it is designed to benefit the persons from whom the funds are collected. Respondent misreads *Nebeker* and *Millard.* In neither of those cases did the Court state that a bill *must* benefit the payor to avoid classification as a revenue bill. Indeed, had the Court adopted such a caveat, the Court in *Nebeker* would have found the statute to be unconstitutional. There, the Court expressly identified the "people" generally, rather than the banking associations required to pay the tax, as the beneficiaries of the system of currency at issue. 167 U. S., at 203. It nevertheless found that the bill was not a revenue bill, stating that a bill creating a discrete governmental program and providing sources for its financial support is not a revenue bill simply because it creates revenue, a holding that was reaffirmed by *Millard.* See *supra*, at 397–398. Thus, the beneficiaries of the bill are not relevant.[7]

---

[7] A different case might be presented if the program funded were entirely unrelated to the persons paying for the program. Here, § 3013 targets people convicted of federal crimes, a group to which some part of the expenses associated with compensating and assisting victims of crime can

Section 3013 is not a "Bil[l] for raising Revenue." We therefore need not consider whether the Origination Clause would require its invalidation if it *were* a revenue bill. *Nebeker*, 167 U. S., at 203 (holding consideration of origination question "unnecessary" in light of finding that bill was not a revenue bill).

### IV

We hold that this case does not raise a political question and is justiciable. Because the bill at issue here was not one for raising revenue, it could not have been passed in violation of the Origination Clause. The contrary judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

In my opinion, a bill that originated unconstitutionally may nevertheless become an enforceable law if passed by both Houses of Congress and signed by the President. I therefore believe that it is not necessary to decide whether 18 U. S. C. § 3013 was passed in violation of the Origination Clause.

### I

The Origination Clause appears in Article I, § 7, of the Constitution, which describes the procedures that the two Houses of Congress and the President shall follow when enacting laws.[1] The Origination Clause is the first of three

---

fairly be attributed. Whether a bill would be "for raising Revenue" where the connection between payor and program was more attenuated is not now before us.

[1] The first two paragraphs of § 7 provide in full:

"All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

"Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return

Clauses in that section.   The Clause provides that "All Bills for raising Revenue shall originate in the House of Representatives," but it does not specify what consequences follow from an improper origination.

The immediately following Clause, however, does speak to consequences.   The second Clause of § 7 says, among other things, that "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States." An improperly originated bill passed by both Houses would seem to be within a class comprising "Every" bill passed by both Houses, and it therefore seems reasonable to assume that such an improperly originated bill is among those that "shall . . . be presented to the President."   The Clause further states that if the President returns to Congress a bill presented to him, and if two-thirds of each House thereafter approves the bill, "it shall become a Law."   No exception to this categorical statement is made for bills improperly originated.

The second Clause of § 7 later provides that "any Bill" not acted upon by the President within 10 days "shall be a Law, in like Manner as if he had signed it."   In this instance, one express exception is made: If Congress adjourns before the

it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it.   If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.   But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively.   If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."

10-day period expires, the bill "shall not be a Law." Again, no exception is made for bills improperly originated.

It is fairly inferred from this language that some bills may become law even if they are improperly originated. It does not, however, necessarily follow that the bill now at issue became law even if improperly originated. That bill is not governed by the provisions just discussed, because it was signed by the President and hence did not become law by virtue of either Presidential inaction or the override of a veto. The language in § 7 dealing with bills signed by the President speaks in terms of necessary, rather than sufficient, conditions: The Clause states only that bills must be presented to the President and that if "he approves he shall sign it." The Clause does not say that any bill signed by the President becomes law, although it does later say that a bill not acted upon becomes law "in like Manner as if he had signed it." In my view, the sufficiency of the procedural conditions in the second Clause is reasonably supplied by implication. I accordingly interpret § 7 to provide that even an improperly originated bill becomes law if it meets the procedural requirements specified later in that section.

## II

My reading of the text of § 7 is supported by examination of the Constitution's purposes. I agree with the Court that the purpose of the Origination Clause is to give the most "'immediate representatives of the people'"—Members of the House, directly elected and subject to ouster every two years—an "effectual weapon" for securing the interests of their constituents. *Ante,* at 395, quoting The Federalist No. 58, p. 359 (C. Rossiter ed. 1961). For four reasons, I believe that examination of this purpose supports the view that the binding force of an otherwise lawfully enacted bill is not vitiated by an Origination Clause violation.

First, the House is in an excellent position to defend its origination power. A bill that originates in the Senate,

whether or not it raises revenue, cannot become law without the assent of the House. The House is free to rely upon the Origination Clause to justify its position in a debate with the Senate, regardless of whether constitutional concerns alone drive the House's position. See Bessette & Tulis, The Constitution, Politics, and the Presidency 8–16, in The Presidency in the Constitutional Order (J. Bessette & J. Tulis, eds., 1981) (discussing ways, aside from judicial enforcement, in which the Constitution shapes political behavior). The Senate may expect that an improperly originated bill will confront a coalition in the House, composed of those who oppose the bill on substantive grounds and those who would favor it on substantive grounds but regard the procedural error as too important to ignore. Taxes rarely go unnoticed at the ballot box, and there is every reason to anticipate that Representatives subject to reelection every two years will jealously guard their power over revenue-raising measures.[2]

Second, the House has greater freedom than does the Judiciary to construe the Origination Clause wisely.[3] The House

---

[2] The Court properly observes that the House has an interest in upholding "the *entire* Constitution, not just those provisions that protect its institutional prerogatives." *Ante*, at 392–393 (emphasis in original). I agree. It is, however, true that even if the House should mistake its constitutional interest generally, it is unlikely to mistake its more particular interest in being powerful: That specific interest is instrumental to any broader conception the House might have of its duties and interests.

Nevertheless, the Court is again correct to say that the possibility of legislative enforcement does not supply a prudential, nonconstitutional justification for abstaining from constitutional interpretation. *Ibid.* My point is rather that this possibility is relevant to the substantive task of interpreting § 7 itself.

[3] Respondent observes that the House "has not assumed that it is the final arbiter of the Origination Clause," but has instead "looked to court decisions for guidance in determining whether to return bills to the Senate." Brief for Respondent 11. Although respect for our power of judicial review is a constitutional necessity in the ordinary case, it is not clear that the House's deference is either necessary or wise with respect to this issue. Indeed, a decision by this Court to pass upon Origination Clause

may, for example, choose to interpret "Bills for raising Revenue" by invoking a test that turns largely upon the substantive economic impact of the measure on society as a whole, or may determine the House of origination by identifying the legislators who were most responsible for the content of the final version of the bill. If employed by the House, rather than the Judiciary, inquiries so searching obviously create no tension between enforcement of the Origination Clause and the democratic principle of the legislative process—a principle which the Clause itself is designed to serve. The House may also examine evidence, including informal private disclosures, unavailable (or incomprehensible) to the Judiciary.

Third, the House is better able than this Court to judge the prejudice resulting from an Origination Clause violation, and so better able than this Court to judge what corrective action, if any, should be taken. The nature of such a power may be comprehended by analogy to our own recognition that a constitutional defect in courtroom procedure does not necessarily vitiate the outcome of that procedure. See *Chapman* v. *California*, 386 U. S. 18 (1967). I see no reason to believe that a defect in statehouse procedure cannot also be harmless: A tax originated in the Senate may nevertheless reflect the views of the people as interpreted by the House, whether because of a coincidence in the judgment of the two branches or because the House directly influenced the Senate's labor. The House's assent to an improperly originated bill is unlikely to be given if its Members believe that the procedural defect harmed the bill's substance. Yet, it would be difficult to imagine how this Court could reasonably assess the prejudice resulting from any particular Origination Clause violation. On my interpretation of § 7, the Constitution confides this responsibility to the House of Representatives instead. One consequence of this interpretation is that an expansive construction of the Clause by the House need

---

questions may be an unfortunate inducement to the House to forbear from an independent inquiry into the interpretive issues posed by the Clause.

not impose spurious formalities, since spurious violations may be ignored.

Fourth, the violation complained of by respondent is unlike those constitutional problems which we have in the past recognized as appropriate for judicial supervision.[4] This case is not one involving the constitutionality of statutes alleged to effect prospective alterations in the constitutional distribution of power. See *INS* v. *Chadha*, 462 U. S. 919 (1983); *Bowsher* v. *Synar*, 478 U. S. 714 (1986); *Morrison* v. *Olson*, 487 U. S. 654 (1988). No defect in the representative process threatens to impede a democratic solution to the problem at issue. See *Powell* v. *McCormack*, 395 U. S. 486 (1969); *Reynolds* v. *Sims*, 377 U. S. 533 (1964). No claim is made that this statute deals with subjects outside the sweep of congressional power, see *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985), or that the statute abrogates the substantive and procedural guarantees of the Bill of Rights, see, *e. g.*, *Buckley* v. *Valeo*, 424 U. S. 1 (1976). Nor, finally, does respondent contend that the Constitution has been violated because action has been taken in derogation of structural bulwarks designed either to safeguard groups specially in need of judicial protection, or to tame the majoritarian tendencies of American politics more generally. See *Chadha, supra; Powell, supra; United States* v. *Carolene Products*, 304 U. S. 144, 152, n. 4 (1938); *Hampton* v. *Mow Sun Wong*, 426 U. S. 88 (1976). Indeed, this case presents perhaps the weakest imaginable justification for judicial invalidation of a statute: Respondent contends that the Judiciary must intervene in order to protect a power of the most majoritarian body in the Federal Government, even though that body has an absolute veto over any

---

[4] This observation bears upon the plausibility of an interpretation of the Origination Clause that effectively insulates origination problems from judicial review. See *Cohens* v. *Virginia*, 6 Wheat. 264, 384–385 (1821).

effort to usurp that power. The democratic structure of the Constitution ensures that the majority rarely if ever needs such help from the Judiciary.[5]

These considerations reinforce my construction of the text of § 7 and lead me to conclude that the statute before us is law regardless of whether it was improperly originated. As a practical matter, this reading of the Constitution precludes judicial review of alleged violations of the Origination Clause. It is up to the House of Representatives to enforce that provision by refusing its consent to any revenue bills that originate in the Senate.[6] The Court's holding, however, may itself be not too far removed from such a consequence: The Court's essential distinction between revenues allocated to particular programs and those allocated to the General Treasury, *ante,* at 397–398, tends to convert the Origination Clause

---

[5] I agree with the Court that the Origination Clause is intended to "safeguard liberty." *Ante,* at 395. Indeed, this must be true, in a general sense, of almost every constitutional provision, since the Constitution aims to "secure the Blessings of Liberty." U. S. Const., Preamble. Of course, the Constitution aims as well to create a Government able to "promote the general Welfare," but liberty and welfare should ultimately coincide.

I also believe, however, that some constitutional provisions are designed to protect liberty in a more specific sense: They protect the rights of individuals as against the majority. Other provisions give the majority sufficient power to act effectively, within limits. In this sense, the First Amendment secures liberty in a way that the Origination Clause does not.

[6] The President obviously might choose to enforce the provision by vetoing an improperly originated bill. It seems clear that the President has the power to do so; it is less clear whether the President has any constitutional duty to police the internal processes of the Congress, or whether he has instead a constitutional duty to defer to Congress on such matters. These issues must be determined by the President; they are not ones we need resolve. It is noteworthy, however, that Article I, § 7, does supply a textual basis for inferring that the President has some constitutional responsibility with respect to matters of origination: Upon vetoing a bill, the President must return it to the House "in which it shall have originated." That phrase is manifestly ambiguous in the case of an improperly originated bill.

into a formal accounting requirement, so long as the House consents.[7]

In all events, I think that both a literal and a practical interpretation of the Origination Clause is consistent with the conclusion that a revenue bill becomes a law whenever it is passed by both Houses of Congress and duly signed by the President. Accordingly, I concur in the Court's judgment.

JUSTICE SCALIA, concurring in the judgment.

*Marshall Field & Co.* v. *Clark*, 143 U. S. 649 (1892), held that federal courts will not inquire into whether the enrolled bill was the bill actually passed by Congress:

> "The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. . . . The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated: leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution." *Id.*, at 672.

---

[7] The Court's interpretation of the Clause does not appear to prevent the House from interpreting the Clause more aggressively, although the Court does effectively deny the House the power to "deem harmless" a violation of the Clause.

This salutary principle is also supported by the uncertainty and instability that would result if every person were "'required to hunt through the journals of a legislature to determine whether a statute, properly certified by the speaker of the house and the president of the senate, and approved by the governor, is a statute or not.'" *Id.*, at 677 (quoting *Weeks* v. *Smith*, 81 Me. 538, 547, 18 A. 325, 327 (1889)).

The same principle, if not the very same holding, leads me to conclude that federal courts should not undertake an independent investigation into the origination of the statute at issue here. The enrolled bill which, when signed by the President, became the Victims of Crime Act of 1984, 98 Stat. 2170, bore the indication "H. J. Res. 648." The designation "H. J. Res." (a standard abbreviation for "House Joint Resolution") attests that the legislation originated in the House. Such an attestation is not explicitly required by the Constitution, but is reasonably necessary to the operation of Art. I, § 7, cl. 2, which requires the President, if he desires to veto a bill, to "return it, with his Objections to that House in which it shall have originated." The President can hardly be expected to search the legislative journals (if they have even been printed by the time his veto must be cast) in order to determine where to direct his veto message. Indeed, it can be said that the attestation is reasonably necessary to the operation of Art. I, § 7, cl. 1 (the Revenue-Origination Clause), itself. The President, after all, is bound not to *sign* an improperly originated revenue bill by the same oath that binds us not to *apply* it, so he must have a ready means of knowing whence it came.

The enrolled bill's indication of its House of origin establishes that fact as officially and authoritatively as it establishes the fact that its recited text was adopted by both Houses. With respect to either fact a court's holding, based on its own investigation, that the representation made to the President is incorrect would, as *Marshall Field* said, manifest a lack of respect due a coordinate branch and produce un-

certainty as to the state of the law. I cannot imagine this Court's entertaining a claim that purportedly vetoed legislation took effect because, although the President returned it to the House of origination indicated on the enrolled bill, that was not the *real* house of origination. It should similarly accept the congressional representation in the present case. We should no more gainsay Congress' official assertion of the origin of a bill than we would gainsay its official assertion that the bill was passed by the requisite quorum, see Art. I, § 5, cl. 1; or any more than Congress or the President would gainsay the official assertion of this Court that a judgment was duly considered and approved by our majority vote. Mutual regard between the coordinate branches, and the interest of certainty, both demand that official representations regarding such matters of internal process be accepted at face value.

This disposition does not place forever beyond our reach the only issue in this area that seems to me appropriate for judicial rather than congressional resolution: what sort of bills constitute "Bills for raising Revenue," Art. I, § 7, cl. 1. Whenever Congress wishes to preserve the possibility of a judicial determination on this point, all it need do is originate the bill that contains the arguably revenue-raising measure in the Senate, indicating such origination on the enrolled bill, as by the caption "S. J. Res." This Court may thereby have the last word on what constitutes a bill for raising revenue, and Congress the last word on where a particular bill has originated—which seems to me as it should be.

For these reasons, I concur in the judgment of the Court.