925 F.2d 399
 SPERRY CORPORATION and Sperry World Trade, Inc., Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 No. 88-1009.
 United States Court of Appeals,
Federal Circuit.
 Jan. 31, 1991.
 
 John D. Seiver, Cole, Raywid & Braverman, Washington, D.C., argued for plaintiffs-appellants. With him on the brief were Alan Raywid, Susan Paradise Baxter and Robert G. Scott, Jr.
 Terrence S. Hartman, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Russell Munk and Francine McNulty Barber, Dept. of the Treasury and Ronald Bettauer and Lisa Grosh, Dept. of State, of counsel.
 Before MARKEY, Circuit Judge, COWEN, Senior Circuit Judge, and MAYER, Circuit Judge.
 MARKEY, Circuit Judge.
 
 
 1
 The Sperry Corporation and Sperry World Trade, Inc. (Sperry)[1] appeal from a judgment of the United States Claims Court holding, inter alia that the Iran Claims Settlement Act (Act)[2] was not enacted in violation of the Origination Clause of the Constitution. Sperry Corp. v. United States, 12 Cl.Ct. 736 (1987). We affirm.
 
 BACKGROUND
 
 2
 In the Claims Court opinion cited above, that court held that the Act did not constitute a taking under the Just Compensation clause of the Fifth Amendment and was not violative of the Origination Clause of the Constitution, Art. 1, Sec. 7. Having reversed on the taking issue, this court declined to reach Sperry's Origination Clause arguments. Sperry Corp. v. United States, 853 F.2d 904 (Fed.Cir.1988). The Supreme Court reversed, having determined that the Act's 1.5% deduction from awards of the Iran-United States Claims Tribunal (Tribunal) was a "reasonable user fee". The Court rejected Sperry's Due Process and equal protection arguments and declined to reach the Origination Clause issue. United States v. Sperry Corp., --- U.S. ----, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). The case is thus here on remand from the Supreme Court for consideration of Sperry's Origination Clause arguments.[3]
 
 OPINION
 
 3
 The Origination Clause reads: "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." U.S. Const. art. I, Sec. 7.[4] Sperry says the Act originated as a bill "for raising Revenue" because it: (1) created a deduction from Tribunal awards independently of and four years after the establishment of the Tribunal; and (2) had the raising of revenue as its primary purpose.
 
 1. Independent Creation
 
 4
 Sperry asks us to apply a bright line standard under which a user fee originating in the Senate violates the Origination Clause whenever it is not established in the same legislation as that establishing the program to which the fee relates. However, the Supreme Court's caution against attempting a general statement to cover every possible phase in determining whether bills are violative of the Origination Clause, Twin City Bank v. Nebeker, 167 U.S. 196, 202, 17 S.Ct. 766, 768, 42 L.Ed. 134 (1896), is directly applicable to this case.
 
 
 5
 In citing United States v. Munoz-Flores, --- U.S. ----, 110 S.Ct. 1964, 1972, 109 L.Ed.2d 384 (1990) for its statement that "a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support government generally, is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause", Sperry confuses sufficiency with necessity. That Munoz-Flores recognizes simultaneous creation of a service and a fee for its use as sufficient to render a Senate-originated user fee bill constitutionally permissible in a particular case does not mean that simultaneous creation is in every case a constitutional necessity.
 
 
 6
 In sum, the test under the Origination Clause is what was enacted, not when was the enactment. If a bill is not one for "raising revenue" it may originate in the Senate, and we are aware of no constitutional provision that would govern the timing of its enactment. The same, of course, is true of a bill that is one for "raising revenue"; its enactment is constitutionally prohibited, regardless of its place in a legislative sequence. Simultaneous enactment of bills creating a service and assessing a fee may serve as some evidence that the involved charge is a user fee, but the absence of simultaneous enactment cannot alone mandate a determination that the involved bill is one "for raising revenue".
 
 2. Purpose of the Act
 
 7
 The Supreme Court has said: "revenue bills are those that levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue." Twin City Bank v. Nebeker, 167 U.S. 196, 202, 17 S.Ct. 766, 769, 42 L.Ed. 134 (1897). Sperry does not say the bill that led to the Act levied taxes but does say it was not a bill for "other purposes" because its primary purpose was the raising of revenue. Sperry has shown no error, however, in the Claims Court holding that raising revenue was not the primary purpose of the bill that led to the Act.
 
 
 8
 Sperry's attempt to minimize those provisions of the bill that deal with other purposes must fail. It rests on assertions that some of those other purposes are inapplicable to Sperry's present claim and that some others occupy fewer lines in the bill than does the deduction section. However, the nature of a litigant's claim cannot retroactively control the nature of a bill and line counting bears no relationship to the relative importance of sections of a bill. Indeed, application of Sperry's reasoning would render the deduction section less important, for it occupies fewer lines than do some other provisions. Sperry has simply not demonstrated that the deduction provision is of such "overwhelming importance" as to convert what was a bill establishing a user fee into a bill for raising revenue.
 
 
 9
 That the one and a half percent deductions are recovered as "miscellaneous receipts" into the United States Treasury does not of itself, as Sperry argues, require a holding that revenue raising was the Bill's primary purpose in this case. Providing funds to the general Treasury does not necessarily and in every instance make a bill one "for raising revenue." Munoz-Flores upheld a law which required funds collected beyond an annual cap to be "deposited in the general fund of the Treasury." See 42 U.S.C. Sec. 10601. Though the 1.5% deduction was here fully recoverable in the Treasury, we cannot accept that circumstance as sufficient to undermine or counter the purpose stated by Congress in the Act. As the Supreme Court said in United States v. Sperry, 110 S.Ct. at 392, "Section 502(a) states that these charges are to be deducted 'as reimbursement to the United States Government for expenses incurred in connection with the arbitration of claims of United States claimants against Iran before [the] Tribunal ...' ".[5]
 
 
 10
 It may be that earmarking every user fee for payment directly into an account controlled by the agency rendering the service would or would not make easier the publication of a "regular Statement and Account of the Receipts and Expenditures of all public money", Const. Art. 1, Sec. 9, cl. 7. Such a practice might also aid the courts in identifying a user fee. But the in-bound routing of government receipts is a matter for the Congress, not the courts, to decide, and, again, we are aware of no constitutional provision against recovery of user fees into the Treasury.
 
 
 11
 The judgment of the Claims Court is AFFIRMED.
 
 
 12
 MAYER, Circuit Judge, dissenting.
 
 
 13
 This case is not about whether Congress has authority to assess a user fee on private entities, like Sperry, that benefit from the Iran-United States Claims Tribunal. Nor is it about the extent to which the fee assessed must approximate the benefits received. The Supreme Court has settled both of those issues. United States v. Sperry Corp., 493 U.S. ----, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). The question instead is whether the method Congress belatedly chose to implement the fee runs afoul of the origination clause of the Constitution. Because I believe the Iran Claims Settlement Act originated in the Senate as a bill intended primarily to raise revenue, notwithstanding the government's post hoc protestations to the contrary, I respectfully dissent.
 
 
 14
 The Supreme Court has consistently held that "bills for raising revenue" within the meaning of the origination clause "are those that levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue." United States v. Munoz-Flores, 495 U.S. ----, ----, 110 S.Ct. 1964, 1972, 109 L.Ed.2d 384 (1990); Millard v. Roberts, 202 U.S. 429, 436, 26 S.Ct. 674, 675, 50 L.Ed. 1090 (1906); Twin City Bank v. Nebeker, 167 U.S. 196, 202, 17 S.Ct. 766, 768, 42 L.Ed. 134 (1897); United States v. Norton, 91 U.S. 566, 569, 23 L.Ed. 454 (1876). "The Court has interpreted this general rule to mean that a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support government generally, is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause." Munoz-Flores, 495 U.S. at ----, 110 S.Ct. at 1972 (emphasis added).
 
 
 15
 Thus the special assessment on persons convicted of federal misdemeanors at issue in Munoz-Flores, 18 U.S.C. Sec. 3013 (1982 & Supp. V 1987), did not violate the origination clause because it raised revenue primarily to support the simultaneously enacted Crime Victims Fund. 495 U.S. at ----, 110 S.Ct. at 1972. A single statute, the Victims of Crime Act of 1984, established both the assessment and the Fund. Id. And though a portion of the assessments could be deposited in the general fund of the Treasury if Fund income exceeded a prescribed cap, the Court stressed that only one such excess occurred, that only a small percentage of the excess could be attributed to the special assessments, and that Congress assumed neither the assessments themselves nor any excess would be substantial. Id. at ----, 110 S.Ct. at 1973. The Court concluded, "As in Nebeker and Millard, then, the special assessment provision was passed as part of a particular program to provide money for that program...." Id. (emphasis added).
 
 
 16
 Nebeker had upheld against an origination clause challenge "an act of Congress providing a national currency secured by a pledge of bonds of the United States, and which, in the furtherance of that object, and also to meet the expenses attending the execution of the act, imposed a tax on the notes in circulation of the banking associations organized under the statute...." 167 U.S. at 202, 17 S.Ct. at 769 (emphasis added). Similarly, Millard rejected an origination clause challenge to a set of acts that levied taxes on private property in the District of Columbia to finance railroad improvements. Again the acts established funding mechanisms simultaneously with the programs Congress intended those mechanisms to support, and money thus raised went directly and exclusively to support the programs. The Court observed, "Whatever taxes are imposed are but means to the purposes provided by the act." 202 U.S. at 437, 26 S.Ct. at 675.
 
 
 17
 The Munoz-Flores Court could have highlighted a third case. In United States v. Norton, 91 U.S. 566, 569, 23 L.Ed. 454 (1876), the Court construed the phrase "revenue laws" in an 1804 act of Congress as equivalent to " '[b]ills for raising revenue' [within the meaning of the origination clause] when enacted into laws." The act established a postal money-order system and provided that "all moneys received from the sale of money-orders, all fees received for selling them, and all moneys transferred in administering the act ... 'be deemed and taken to be money in the treasury of the United States.' " Id. 91 U.S. at 568. It also authorized deputy-postmasters to withhold a portion of the revenue thus collected to compensate themselves and other clerks. Nevertheless, the Court held the act was not a revenue law. That the act appropriated $100,000 "to meet any deficiency in the amount of such proceeds during the first year" was critical to the decision--a "willingness ... to sink money" suggesting that Congress' purpose was, as avowed, "to promote public convenience, and to insure greater security in the transmission of money through the United States mails" rather than to raise revenue generally for the use of the government. Id.
 
 
 18
 None of the facts critical to the outcome of these earlier cases is present here. The Iran Claims Settlement Act neither creates a separate fund for the user fee proceeds, like the Crime Victims Fund in Munoz-Flores, nor otherwise earmarks the funds for the support of a particular program, as was true in fact if not in law of the exactions in Millard, Nebeker, and Norton. The Act and its user fee do not, like "the Victims of Crime Act and special assessment [at issue in Munoz-Flores,] virtually mirror the statutes approved in Twin City [Bank v. Nebeker], Norton, and Millard." United States v. Simpson, 885 F.2d 36, 41 (3d Cir.1989). Instead, deductions pursuant to sections 501(b)(2) and 502(a) are deposited to the credit of miscellaneous receipts in the Treasury. See 22 U.S.C. Sec. 1626(b) (1988); Iran Claims Settlement Act, Sec. 502(b), 50 U.S.C. Sec. 1701 note (Supp. IV 1986).
 
 
 19
 More importantly, the Senate proposed and the Congress adopted the funding mechanism of the Iran Claims Settlement Act some four and one half years after the Algiers Accords established the "program" allegedly intended to be supported. Contrary to the Claims Court's assertion, the Act was not "designed to provide a forum for United States nationals to litigate their claims against the government of Iran." 12 Cl.Ct. at 742. The Algiers Accords and implementing executive orders had done that in 1981. See Sperry, 493 U.S. at ----, 110 S.Ct. at 395.[1] Unlike every other case in which the Supreme Court has sustained an act in the face of origination clause challenge, we have here two acts[2] separated by several years.
 
 
 20
 Again, the question is not whether Congress can retroactively impose the section 502 fee, whether the amount of the fee is reasonable, or whether only successful claimants like Sperry should in fairness pay it. The question is how Congress must adopt the fee to further its stated desire of "promot[ing] the prompt and efficient processing of claims made by U.S. citizens and corporations against the Government of Iran," 131 Cong.Rec. S6489 (daily ed. May 17, 1985) (statement of Sen. Evans), when the institutional apparatus for doing so has long been in place. That Congress hastily enacted the fee in response to judicial invalidation of Treasury's earlier attempt to impose a similar fee, see id. at S6490; Sperry, 493 U.S. at ----, 110 S.Ct. at 392, suggests that damage control, not cost control, was its animating force.
 
 
 21
 The Act's co-sponsor, Senator Evans, frankly admitted as much. On May 17, 1985, some two weeks after the Claims Court invalidated the Treasury Department's administratively imposed fee but before the court had entered final judgment, Senator Evans concluded his introduction of S. 1166, the Act's originating bill, this way:
 
 
 22
 Our legislation would ensure that the bulk of the amounts recovered to date [through Treasury's Directive License, invalidated May 1, 1985 by the Claims Court], over $6 million, would remain in the Treasury. Further, it would guarantee that an additional $12 to $20 million in revenues, which the Department of State estimates would be collected under our bill, would go into the Treasury to offset the deficit.
 
 
 23
 131 Cong.Rec. S6490 (emphasis added). At a meeting of the Senate Foreign Relations Committee three days later, Senator Evans reiterated, "Chairman Lugar and I promised to move swiftly on a bill. Seldom, if ever, does the Foreign Relations Committee have an opportunity to restore funds to the public first [sic, fisc]. We pledged that this opportunity will not be lost." Senate Hearings at 2.
 
 
 24
 These statements are far more compelling than the legislative history relied upon by the Ninth Circuit in Munoz-Flores--that Congress expected the special assessment to "constitute new income for the Federal government," United States v. Munoz-Flores, 863 F.2d 654, 658 (9th Cir.1988)--but discounted by the Supreme Court because the passage from which the quoted statement came, "[r]ead in its entirety, ... clearly evidences Congress' intent that [the assessment] provide funds primarily to support the Crime Victims Fund." Munoz-Flores, 495 U.S. at ----, 110 S.Ct. at 1973. Not only are the statements themselves more illuminating; they are, by virtue of their source, entitled to substantial weight as evidence of Congress' true intent. FEA v. Algonquin SNG, Inc., 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976). Second, the context in which they were made belies what Congress asserts in the statute as its motivation. Unlike Munoz-Flores and the earlier Supreme Court cases, here there is no separate fund or other earmarking of the revenue collected, and no simultaneous enactment of a program and its funding mechanism as part of a larger scheme. There is only rhetoric: section 502(a) states that the fees collected are intended to reimburse the government "for expenses incurred in connection with the arbitration of claims of United States claimants against Iran before th[e] Tribunal and the maintenance of the Security Account," and the legislative history is rife with references to the expenses borne by the government for the same purposes, see, e.g., 131 Cong.Rec. S6490; Senate Hearings at 14-15, 26-27. But no amount of post hoc rationalization should obscure what the facts of this case clearly show--a naked attempt to raise revenue for general government purposes, belatedly placed in the context of supporting a particular program and shrewdly couched in the language of reimbursement for benefits conferred.
 
 
 25
 The Act's other provisions neither negate nor override its essential revenue-raising purpose. I have already mentioned section 501, which does not apply to Sperry but allows the Secretary of the Treasury to impose a similar fee on small claimants.[3] Sections 503 and 504 are merely technical. Section 503 prevents the duplicative assessment of fees on small claimants, while section 504 authorizes the Secretary of the Treasury to reimburse the Federal Reserve Bank of New York for expenses incurred as a fiscal agent of the United States in implementing the Algiers Accords. The Act's only other substantive provision, section 505, insures the confidentiality of Tribunal records. It reflects a congressional concern independent of, but decidedly secondary to, the revenue-raising function of section 502. It is apparent from the legislative history that Congress devoted far more attention to section 502 than to the other four sections of the Act combined. See, e.g., 131 Cong.Rec. S6489-90; Senate Hearings at 1-2, 13-32.
 
 
 26
 Nor do the fees imposed by section 502 further the purpose of any other sections of the Act. Section 501 does not apply to Sperry and, in any event, has its own preexisting fee scheme. The fees of section 502 do not provide the Federal Reserve Bank's reimbursement pursuant to section 504. The Bank makes the deductions required by section 502(a) and forwards them to Treasury; it is not authorized to retain any of the proceeds as reimbursement for its services. Finally, the exactions of section 502 obviously do not help maintain the confidentiality of Tribunal records pursuant to section 505.
 
 
 27
 The Act's omnibus character makes any attempt to determine its "primary purpose" misdirected if not disingenuous. The Act simply does not establish, nor is it a part of, a comprehensive statutory scheme of the type sustained in Munoz-Flores, Millard, Nebeker, and Norton--for me, profoundly persuasive that it violates the origination clause. If the origination clause is to have any vitality, if, like the constitutional provisions about relations between the branches of government, it is truly to "safeguard liberty," see Munoz-Flores, 495 U.S. at ----, 110 S.Ct. at 1971 it must have teeth in a case where Congress adopts a tax years after the establishment of the program the tax is allegedly intended to finance, deposits the proceeds in a general Treasury fund, and admits through the statements of a legislative sponsor that the proceeds are really intended either to reduce the federal budget deficit or to support the operation of government generally. Congress can pass such an act, of course, but it must originate in the House of Representatives. That is to say, Congress must abide by the Constitution just like everyone else.
 
 
 28
 Time and events may have eroded the conceptual underpinnings of the origination clause--that one can better protect his purse in the House than the Senate, see Munoz-Flores, 495 U.S. at ----, 110 S.Ct. at 1971--but we should apply the Constitution as we find it, not as Congress thinks it should be. The Iran Claims Settlement Act raises revenue within the meaning of the origination clause; because the parties do not dispute that it originated in the Senate and did not amend a House revenue-raising bill, it is unconstitutional.
 
 
 
 [1]
 Sperry Corporation merged with Burroughs Corporation and the successor corporation is named UNISYS Corporation
 
 
 [2]
 Title V of the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub.L. No. 99-93, Secs. 501-05, 99 Stat. 437-39, 50 U.S.C. Sec. 1701 note (Supp. IV 1986). We deal here only with the Iran Claims Settlement Act
 
 
 [3]
 The descriptions of the relevant facts in the opinions cited above make a repetition here unnecessary
 
 
 [4]
 Sperry says the Act amends a House-originated bill that clearly was not a revenue raising bill. That the Senate was not here exercising its power under the Constitution to amend a revenue-raising bill, does not, however, mean that a bill that is not itself a revenue-raising bill may not originate in the Senate. The dispositive issue here is thus the nature of the bill that resulted in the Act
 
 
 [5]
 Nothing here said should be taken as suggesting a view that the Senate may constitutionally originate and enact revenue-raising bills so long as it merely describes such bills as "user fees" or "reimbursement" of governmental program expenses
 
 
 [1]
 There is one category of claims for which the Act did potentially make available a "new" forum. Section 501(a) confers on the Foreign Claims Settlement Commission the authority "to receive and determine the validity and amounts of claims by nationals of the United States against Iran which are settled en bloc by the United States." See 22 U.S.C. Secs. 1621-27. However, this "standby" forum--it becomes available only if Iran and the United States enter an en bloc settlement, at the time of the Act's passage a dubious prospect, see Iran Claims Legislation: Hearing on S. 771 and S. 1166 Before the Senate Comm. on Foreign Relations, 99th Cong., 1st Sess. 24 (1985) [Senate Hearings ]--was not available to Sperry. The legislative history says that only claims worth less than $250,000 are subject to en bloc settlement, id. at 14, 24-25, "small claims" for which the Algiers Accords obligate the United States to act as agent before the Iran-United States Claims Tribunal. See Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran [Accord 2], art. III Sec. 3, reprinted in 19 Bureau of Public Affairs, U.S. Department of State, Selected Papers (Mar. 12, 1981). Large claimants like Sperry can negotiate directly with the government of Iran and, if successful, formally resolve their disputes by requesting the Tribunal to record their settlement agreements as "awards on agreed terms"; they have no recourse to the Foreign Claims Settlement Commission
 
 
 [2]
 It is of no consequence that the first "act," the Algiers Accords, is embodied in a set of executive agreements. There is no doubt that the Accords could have included a specific mechanism for financing the United States' half share of Tribunal costs. Accord 2, art. VI Sec. 3; see Dames & Moore v. Regan, 453 U.S. 654, 680-85, 101 S.Ct. 2972, 2987-90, 69 L.Ed.2d 918 (1981)
 
 
 [3]
 The alternative fee for small claimants, assessed under the International Claims Settlement Act of 1949, as amended, is higher. See 50 U.S.C. Sec. 1701 note, at Sec. 501(a), (b)(2); 22 U.S.C. Sec. 1626(b) (1988). That Act, unlike the Iran Claims Settlement Act, simultaneously created the International Claims Commission of the United States (later transferred from the Department of State to the Department of Justice and renamed the Foreign Claims Settlement Commission, see 22 U.S.C. Secs. 1622 note, 1622a (1982)) and its funding mechanism. See Pub.L. No. 455, ch. 54, 64 Stat. 12 (1949). Thus section 501(b)(2) provides for a discretionary decrease in fees long ago established and only potentially assessed against small claimants for use of the Foreign Claims Settlement Commission. It does not assess a new fee for use of the Iran-United States Claims Tribunal