KAVANAUGH, Circuit Judge,
with whom Circuit Judges HENDERSON, ■BROWN, and GRIFFITH join,
dissenting from the denial of rehearing en banc:
This case raises a serious constitutional question about the 2010 Affordable Care Act, one of the most consequential laws ever enacted by Congress. Did Congress’s enactment of the Act comport with the Origination Clause of the Constitution? The Origination Clause provides: “All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.” U.S. Const, art. 1, § 7, cl. 1. The Origination Clause therefore requires that bills for “raising Revenue” originate in the House of Representatives. Revenue bills may be amended in the Senate “as on other Bills,” but they must originate in the House. If the Affordable Care Act did not meet the requirements of the Origination Clause, then the Act — or at least revenue-raising provisions such as the individual mandate — must be invalidated. ,
In my view, the Affordable Care Act complied with the Origination Clause, but not for the reason articulated by the three-judge panel opinion. The panel opinion concluded that the Affordable Care Act was not a revenue-raising bill for purposes of the Origination Clause and therefore did not have to originate in the House. In my respectful view, that conclusion is untenable. The Affordable Care Act established new subsidies for the purchase of health insurance and expanded the Medicaid program for low-income Americans. Those new subsidies and expanded entitlements cost an enormous amount of money. So as not to increase the annual budget deficit and the overall national debt, the Act imposed numerous taxes to raise revenue. Lots of revenue. $473 billion in revenue over 10 years. It is difficult to say with a straight face that a bill raising $473 billion in revenue is not a “Bill for raising Revenue.”
The Affordable Care Act therefore was a revenue-raising bill subject to the Origination Clause. That said, the Act did in fact originate in the House, as required by the Clause. Although the original House bill was amended and its language replaced in the Senate, such Senate amendments are permissible under the Clause’s text and precedent.
So in concluding that the Affordable Care Act complied with the Origination Clause, the panel opinion reached the right bottom line, but relied on what I see as a faulty rationale. Does such a case still *1050 warrant en banc review? Oftentimes no, but here yes. The panel opinion sets a constitutional precedent that is too important to let linger and metastasize. Although no doubt viewed by some today as a trivial or anachronistic annoyance, the Origination Clause was an integral part of the Framers’ blueprint for protecting the people from excessive federal taxation. It is true that the Framers’ decision to grant the Senate a broad amendment power gave the Origination Clause less bite than it otherwise might have had. But the Clause nonetheless has been important historically and remains vital in the modern legislative process. By newly exempting a substantial swath of tax legislation from the Origination Clause, the panel opinion degrades the House’s origination authority in a way contrary to the Constitution’s text and history, and contrary to congressional practice. As a result, the panel opinion upsets the longstanding balance of power between the House and the Senate regarding the initiation of tax legislation. Therefore, I would grant rehearing en banc. In my respectful view, the en banc Court should vacate the panel opinion and rule for the Government on the ground that the Affordable Care Act originated in the House and thereby complied with the Origination Clause.
At oral argument in the Supreme Court’s most recent Origination Clause case some years ago, United States v. Munoz-Flores, 495 U.S. 385, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990), Justice O’Connor posed a hypothetical about a national highway funding bill that increased income taxes to be paid into the general treasury “for that purpose” — that is, to “support the road building.” That hypothetical almost precisely tracks the Origination Clause issue we face in this case. The hypothetical was not presented in Munoz-Flores, but Justice O’Connor asked about it to test the limits of the Government’s theory. The Government attorney dutifully claimed (then as now) that such a hypothetical bill would not be subject to the Origination Clause. Justice O’Connor responded: “Well, that’s a pretty extreme position.” True then. And true now.
I
On October 8, 2009, the House of Representatives passed H.R. 3590, the Service Members Home Ownership Tax Act of 2009. That bill, among other things, modified the first-time homebuyer tax credit for service members, increased some corporate tax prepayment rates, and increased the tax penalty for failing to file certain corporate tax returns. After passing in the House, H.R. 3590 was sent to the Senate. There, Senate Majority Leader Harry Reid offered an “Amendment in the nature of a substitute” to H.R. 3590. The amendment struck all of the language after the bill’s introductory “enacting clause” and inserted in its place the Senate’s version of what became the Affordable Care Act. Instead of introducing a new Senate bill, Senator Reid proceeded via amendment of a House bill. By proceeding in that manner, the Senate recognized that the Origination Clause of the Constitution requires revenue-raising bills to originate in the House. The Senate passed the amended bill on December 24, 2009, and the House in turn passed the amended bill without further change on March 21, 2010. President Obama then signed it into law on March 23, 2010.
Sissel argues that the Affordable Care Act is a bill “for raising Revenue” that had to originate in the House under the Origination Clause of the Constitution. He further contends that the law did not originate in the House. Sissel is correct about the first point but wrong about the second. The Affordable Care Act was a bill for raising revenue. But it originated in the House.
*1051 The Origination Clause appears in Article I, Section 7, Clause 1 of the Constitution. It provides: “All Bills for raising Revenue shall originate in. the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.” Although obscure to many observers today, the Clause was very important to the Framers and remains vital to the modern legislative process. The Origination Clause was one of the many finely tuned mechanisms the Framers adopted to separate power within the new national government, so as to avoid the dangers of concentrated power and thereby protect individual liberty.
To explain the background: At the Constitutional Convention, the structure and powers of the national government were the subject of contentious deliberations. Those deliberations included great debates about the Legislative Branch. Many feared that a single legislative body would become too powerful, swallow up the other Branches, and threaten individual liberty. See generally The Federalist No. 48, at 309 (James Madison) (Clinton Rossiter ed., 1961). In addition, the smaller states worried that representation by population in the national legislature would overwhelm their interests, while the larger states feared that equal representation for each state would unfairly dilute the larger states’ power and make them easy financial targets. See 1 The Records of the Federal Convention of 1787, at 17780 (Max Farrand ed., 1911). To help address some of those concerns, the Framers reached a Great Compromise. The Convention established a bicameral legislature that would divide the legislative power between two bodies, thereby preventing concentration of power in a single legislative assembly. To resolve the large state versus small state dispute, the Great Compromise provided for equal representation by state in the Senate and proportional representation by population in the House.
With two bodies, however, also came the delicate task of allocating legislative powers between the House and Senate. The taxing power was perhaps the most critical. After all, one great failing of the Articles of Confederation was the inability of the national government to tax citizens and fund national priorities such as the military. The delegates at Philadelphia therefore granted Congress a broad power to tax. At the same time, the Framers understood the dangers inherent in the power to tax, namely, that “the power to tax involves the power to destroy.” McCulloch v. Maryland, 17 U.S. 316, 431, 4 Wheat. 316, 4 L.Ed. 579 (1819). They had just fought a war for independence fueled by outrage at taxation without representation.
So the delegates vigorously debated how to divide the power to tax between the House and the Senate. The Convention ultimately decided to grant the House of Representatives the exclusive power to originate tax bills, although the bills would then be open to Senate amendment. As James Madison later explained, the “principal reason” why the Constitution gave exclusive origination power to the House was that members of the House are “chosen by the People,” “best acquainted with their interests,” and subject to “more frequent[ ]” elections. 1 Debates and Proceedings in the Congress of the United States 361 (Joseph Gales ed., 1834).
The Origination Clause was so central to the founding blueprint that one delegate to the Constitutional Convention, reflecting the prevailing sentiment, warned that the “acceptance of the [Constitutional] plan will inevitably fail, if the Senate be not restrained from originating Money bills.” 2 The Records of the, Federal Convention of 1787, at 275 (statement of Elbridge Gerry) (Aug. 13, 1787) (Max Farrand ed., 1911); id. at 5 (statement of Elbridge Ger *1052 ry) (July 14, 1787) (calling the Origination Clause the “corner stone” of the Great Compromise). Likewise, during the crucial ratification debates in New York, Madison stressed the ’ importance of the House’s origination authority. See The Federalist No. 58 (James Madison).
The House’s origination power, like other aspects of the constitutionally established separation of powers, was “not simply an abstract generalization in the minds of the Framers,” but was expressly “woven into the document that they drafted in Philadelphia in the summer of 1787.” Immigration & Naturalization Service v. Chadha, 462 U.S. 919, 946, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (quoting Buckley v. Valeo, 424 U.S. 1, 124, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)) (internal quotation marks omitted).
Those structural details, the Supreme Court has stated many times, are not simply matters of etiquette or architecture. They also help protect individual liberty— in this instance, by ensuring that only those representatives closest to the people can initiate legislation to wrest money from the people. See generally Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 501, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (the “Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty”) (internal quotation marks omitted); Clinton v. City of New York, 524 U.S. 417, 450, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring) (“Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.”); Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc., 501 U.S. 252, 272, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991) (“The ultimate purpose of this separation of powers is to protect the liberty and security of the governed.”); Free Enterprise Fund v. Public Company Accounting Oversight Board, 537 F.3d 667, 714 (D.C.Cir.2008) (Kavanaugh, J., dissenting) (“the separation of powers protects not simply the office and the officeholders, but also individual rights”).
Moreover, what “the Court has said of the allocation of powers among branches is no less true of such allocations within the Legislative Branch.” United States v. Munoz-Flores, 495 U.S. 385, 394, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). “Provisions for the separation of powers within the Legislative Branch are thus not different in kind from provisions concerning relations between the branches; both sets of provisions safeguard liberty.” Id. at 395, 110 S.Ct. 1964.
Because the constitutional structure helps safeguard individual liberty, the Judiciary has long played a critical role in preserving the structural compromises and choices embedded in the constitutional text. The Supreme Court has often explained that, in cases where a plaintiff has standing, the “courts possess power to review either legislative or executive action that transgresses identifiable textual.limits.” Nixon v. United States, 506 U.S. 224, 238, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993); Powell v. McCormack, 395 U.S. 486, 506, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Mar-bury v. Madison, 5 U.S. 137, 176, 1 Cranch 137, 2 L.Ed. 60 (1803) (“The powers of the legislature are defined, and limited,” and “those limits may not be mistaken, or forgotten.”). Consistent with those general principles, the Supreme Court has held that the Judiciary possesses the authority and the responsibility to address and remedy violations of the Origination Clause. See Munoz-Flores, 495 U.S. at 387, 110 S.Ct. 1964. As the Court stated in Munoz-Flores: “Surely a judicial system capable'of determining when punishment is ‘cruel and unusual,’ when bail is ‘[ejxces *1053 sive,’ when searches are ‘unreasonable,’ and when congressional action is ‘necessary and proper’ for executing an enumerated power is capable of making the more prosaic judgments demanded by adjudication of Origination Clause challenges.” Id. at 396,110 S.Ct. 1964.[1]
It is therefore our duty here to assess whether the Affordable Care Act complied with the Origination Clause.
II
The Affordable Care Act is, among other things, a massive tax bill. The Congressional Budget Office forecasted that the Act would raise $473 billion in revenue over 10 years. See Letter from Douglas W. Elmendorf, Director, Congressional Budget Office, to Nancy Pelosi, Speaker of the United States House of Representatives (March 20, 2010), in Congressional Budget Office, Selected CBO Publications Related to Health Care Legislation, 2009-2010, at 21-22 (2010).[2] Those new revenues were indispensable to the law because proponents did not want the law’s new health insurance subsidies and expanded Medicaid entitlements to substantially increase the annual budget deficit and add to the Nation’s overall debt. The new revenues would largely offset the Act’s significant new expenditures on the overall federal balance sheet, or at least that was the hope. The revenue provisions were essential to counter fears and accusations that the new law would bust the budget. See generally Steven Brill, America’s Bitter Pill 164 (2015) (“The main concern at the White House was revenue.”).
The Act contains a wide variety of revenue-raising provisions ranging from the tax penalty on individuals who do not have insurance (commonly known as the individual mandate), to the tax penalty on employers who do not provide insurance, to ■ additional payroll taxes, to new taxes on “Cadillac” health plans, pharmaceutical manufacturers, medical device companies, health insurers, and cosmetic surgery. See Pub.L. No. 111-148, §§ 1501, 1513, 9015, 9001, 9008, 9009, 9010, 9017,124 Stat. 119 (2010). The Act refers to the Internal Revenue Code about 200 times. It also uses the word “tax” about 200 times. It dedicates an entire title to “Revenue Provisions.” See id. tit. IX. And the Congressional Budget Office repeatedly scored the Act’s effects on revenue enhancement and deficit reduction. See Selected CBO Publications Related to Health Care Legislation, 2009-2010.
There may be close calls in determining whether a bill raises revenue for purposes of the Origination Clause. In my view, this case is not a close call. Under the text, history, and precedent of the Origination Clause, a bill such as the Affordable Care Act that raises substantial revenue that is used for general governmental purposes easily qualifies as a bill “for raising Revenue.” As the Supreme Court has explained, the Origination Clause applies *1054 to a “statute that raises revenue to support Government generally.” United States v. Munoz-Flores, 495 U.S. 385, 398, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). That description readily covers the Affordable Care Act.
The Government nevertheless argues (and the panel opinion surprisingly agreed) that the Affordable Care Act is not a revenue-raising bill subject to the Origination Clause. I respectfully but strongly disagree.
To begin with, the Government points out that the Affordable Care Act has purposes other than raising revenue. That is of course true. That is true of most legislation. But that is also irrelevant under the Origination Clause. No case or precedent of which I am aware has said that a law that raises revenues for general governmental use is exempt from the Origination Clause merely because the law has other, weightier non-revenue purposes. Imagine a simple gas tax bill introduced in the Senate. Suppose that the bill is combined with a major national security bill also introduced in the Senate. Does that render the combined Senate bill exempt from the Origination Clause because the national security purposes predominate? Of course not. If it were otherwise, the Senate could systematically evade the Origination Clause by tacking Senate-originated revenue provisions onto other Senate-originated bills. But that is neither the law nor the congressional practice.
Likewise, no case or precedent of. which I am aware has said that a regulatory tax — that is, a tax that seeks in some way to influence conduct — is exempt from the Origination Clause merely because such a tax also has a purpose of encouraging or discouraging certain behavior. It does not matter whether that regulatory purpose might be said to predominate. Imagine the same gas tax bill introduced in the Senate. Suppose that its sponsors say that the bill is designed to discourage excessive driving, encourage the use of public transportation, and help the environment. Does that render it exempt from the Origination Clause? Of course not. Otherwise, most taxes would escape the Origination Clause. After all, virtually every tax has the dual purposes of raising revenue and influencing behavior. To borrow the words of the Supreme Court: “[EJvery tax is in some measure regulatory.” National Federation of Independent Business v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2596, 183 L.Ed.2d 450 (2012) (quoting Sonzinsky v. United States, 300 U.S. 506, 513, 57 S.Ct. 554, 81 L.Ed. 772 (1937)) (internal quotation marks omitted); see also id. at 2596 (“taxes that seek to influence conduct are nothing new”). That is because a tax “interposes an economic impediment to the activity taxed as compared with others not taxed.” Id. at 2596 (internal quotation marks omitted). It is neither the law nor the practice to exempt regulatory taxes from the Origination Clause.
And consider this. Suppose the Affordable Care Act had been split into two bills. One bill had all the subsidies, entitlements, and new regulatory prohibitions. The other bill had all the new taxes and revenue-raising provisions. Even the Government' and the panel opinion would presumably concede that the Origination Clause applies to the latter bill. But when the two bills are combined into one bill, the requirements of the Origination Clause magically disappear, they say. That makes little sense, at least to me.
As a practical matter, moreover, while courts can sometimes identify the various purposes of a law, it is extremely difficult for a Court to identify one predominant purpose. Courts cannot realistically determine the predominant purpose of a regulatory tax, or of a large piece of legislation with numerous provisions and multiple objectives. Indeed, the Supreme Court *1055 has cautioned against trying to divine a legislature’s “primary” purpose. The “search for legislative purpose is often elusive enough, without a requirement that primacy be ascertained.” McGinnis v. Royster, 410 U.S. 263, 276, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973) (citation omitted). Complicating the task still further, each legislator could have a different “primary” purpose for passing a revenue bill. And judicial inquiries into those purposes “would allow courts to peruse legislative proceedings for subtle emphases supporting subjective impressions and preferences.” Id. at 277, 93 S.Ct. 1055; see also Max Radin, Statutory Interpretation, 43 Harv. L.Rev. 863, 870 (1930) (“The chances that of several hundred men each will have exactly the same determinate situations in mind ... are infinitesimally small.”); cf. In re Kellogg Brown & Root, Inc., 756 F.3d 754, 759 (D.C.Cir.2014) (“[Tjrying to find the one primary purpose for a communication motivated by two sometimes overlapping purposes ... can be an inherently impossible task.”).
The panel concurrence in the denial of rehearing en banc confidently says: “The purpose of the ACA was to overhaul the national healthcare system, not to raise revenue.” Panel Concurrence at 9. But the purpose of the Act was to overhaul the national healthcare system and to raise revenue. You couldn’t do the former without also doing the latter.
But put aside the basic theoretical and practical problems with the Government’s argument. The Government’s theory suffers from more fundamental flaws, namely that it contradicts the Origination Clause’s text, history, and precedent.
Consider the text. The text of the Origination Clause unmistakably embraces all bills that are intended to raise revenue. The Clause says that it applies to “All Bills for raising Revenue.” Period. The text of the Clause does not exempt bills that also accomplish other objectives or serve other predominant purposes. As long as the bill raises revenue, the text of the Clause requires that the bill originate in the House.
Importantly, moreover, that text reflects a deliberate choice made by the Framers at Philadelphia. During the Constitutional Convention, Virginia delegate Edmund Randolph proposed that the protections of the Origination Clause apply only to bills that were solely for raising revenue. He suggested in particular that the Clause apply only to “Bills for raising money for the purpose of revenue.” 2 The Records of the Federal Convention of 1787, at 273 (Aug. 13, 1787) (Max Farrand ed., 1911).
James Madison objected to Randolph’s formulation. “In many acts,” Madison presciently said, “the object would be twofold.” Id. at 276 (statement of James Madison) (Aug. 13, 1787). Although the “raising of revenue would be one of them,” how “could it be determined which was the primary or predominant one”? Id. (Aug. 13, 1787). Madison might as well have been speaking about the Affordable Care Act.[3]
*1056 In his statement opposing Randolph’s approach, Madison cited historical experience. He noted that when tensions “first opened” with Great Britain, “their power to regulate trade was admitted. Their power to raise revenue rejected.” Id. (Aug. 13, 1787). Yet it proved impossible to distinguish between the two powers because trade regulations raised revenue in addition to serving other purposes. As Madison summarized: “An accurate investigation of the subject afterward proved that no line could be drawn between the two cases.” Id. (Aug. 13, 1787).
Madison’s view about Randolph’s “for the purpose of revenue” language prevailed, and the Convention defeated Randolph’s proposal by a vote of 7 to 4. See id. at 280 (Aug. 13, 1787).[4] Over the ensuing weeks, the delegates engaged in further back and forth about the Clause, but the “for the purpose of revenue” language never made it into the final version of the Clause.
' The panel concurrence says that the Convention’s formal rejection of the words “for the purpose of revenue” was largely meaningless, a mere stylistic change. In the panel concurrence’s view, the final version of the Clause still applies only to bills for raising revenue “for the purpose of revenue,” even though the Convention deleted the words “for the purpose of revenue.” See Panel Concurrence at 19-20, 2425. James Madison thought otherwise. He believed that deletion of that language mattered substantively. I will go with James Madison on this one.
Consistent with the text and drafting history of the Origination Clause, the House of Representatives has long asserted its Origination Clause prerogative. The House does so by a practice known as “blue-slipping” a Senate bill. Most importantly for this case, the House has regularly asserted its Origination Clause authority against Senate-originated bills that have the “twofold” revenue-raising and regulatory purposes identified by Madison. For example, asserting the Origination Clause, the House has frequently declined to consider Senate-originated bills that would impose regulatory taxes and deter or encourage certain activities. See 3 Lewis Deschler, Deschler’s Precedents of the United States House of Representatives ch. 13, § 15.5 (1977) (bill using tax penalties to deter overfishing); id. § 15.3 (bill using tax exemptions to support the Olympic Games); id. § 15.7 (bill amending the National Firearms Act); see also H.R. 249, 106th Cong. (1999) (bill that relates to a gun tax).
That history of Congressional practice is relevant here because, as the Supreme Court has explained, “[l]ong settled and established practice is a consideration of great weight” in separation of powers cases. National Labor Relations Board v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 2559, 189 L.Ed.2d 538 (2014) (quoting The Pocket Veto Case, 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929)) (alteration in original).
It is true that the House may go beyond the Origination Clause and, as a matter of its own internal rules, require -even non-revenue bills to originate in the House. But that’s not what was happening in those historical examples. In those historical examples (and many others), the House expressly cited and relied on its longstanding interpretation of the Origina *1057 tion Clause. Under Supreme Court precedent, Congress’s longstanding constitutional interpretation and practice does not bind us, but it informs our interpretation. See Zivotofsky v. Kerry, — U.S. -, 135 S.Ct. 2076, 2091-92, 192 L.Ed.2d 83 (2015); Noel Canning, 134 S.Ct. at 2559.
All of the above seems rather straightforward and a matter of common sense in demonstrating that the Origination Clause applies to revenue-raising bills such as the Affordable Care Act. Indeed, back in 2009, the Senate itself understood that the Act was a revenue-raising bill and that the Origination Clause therefore applied to the Act. That is one reason why Majority Leader Reid introduced the Affordable Care Act as an amendment to a House revenue bill rather than as a stand-alone Senate bill.
So how do the Government and the panel opinion reach the contrary conclusion? The answer, in my respectful view, is that they incorrectly read the Supreme Court precedents on the Origination Clause. Those cases have carved out a narrow exception to the Origination Clause for certain relatively unusual statutory schemes. The panel opinion blows that narrow exception up into a giant new exemption from the Origination Clause, even for obviously revenue-raising bills such as the Affordable Care Act, which raises $473 billion in revenue.
The Supreme Court has stated that “revenue bills are those that levy taxes in the strict sense of the word.” Twin City Bank v. Nebeker, 167 U.S. 196, 202, 17 S.Ct. 766, 42 L.Ed. 134 (1897); Munoz-Flores, 495 U.S. at 397, 110 S.Ct. 1964. The Affordable Care Act levies numerous such taxes. To be sure, the Supreme Court has stated that “bills for other purposes which may incidentally create revenue” are not “Bills for raising Revenue” within the meaning of the Clause. Id. But those cases did not exempt from the Origination Clause all laws that have additional or predominant purposes other than raising revenue. Those cases did not exempt regulatory taxes from the Origination Clause. The Supreme Court has been very careful to exclude from the Origination Clause only those bills that have “no purpose by the act or by any of its provisions to raise revenue to be applied in meeting the expenses or obligations of the Government.” Nebeker, 167 U.S. at 203, 17 S.Ct. 766 (emphasis added) (tax on banks used to pay for the printing of currency has “no purpose” to raise general revenue); see also Millard v. Roberts, 202 U.S. 429, 436-37, 26 S.Ct. 674, 50 L.Ed. 1090 (1906) (property tax used to construct railroad infrastructure has “no purpose” to raise general revenue) (internal quotation marks omitted); Munoz-Flores, 495 U.S. at 398-99, 110 S.Ct. 1964 (special assessment on convicted criminals to fund the Crime Victims Fund has “no purpose” to raise general revenue) (internal quotation marks omitted).
What has the Supreme Court meant in carving out this exception or limitation? As the Court’s cases reveal, the critical distinction drawn by the Supreme Court in' its Origination Clause cases is between (i) laws that raise revenues paid into the general treasury and available for general governmental uses and (ii) laws that raise revenues designated for use in a specific program. Laws in the former category— which encompasses the vast majority of laws that raise money — are subject to the Origination Clause. Laws in the latter category are not subject to the Origination Clause.
Indeed, the Supreme Court said this explicitly in Munoz-Flores, its most recent Origination Clause case. The Court quoted the “bills for other purposes which may incidentally create revenue” language from Nebeker. Then the Munoz-Flores Court *1058 immediately stated: “The Court has interpreted this general rule to mean that a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a ‘Bil[l] for raising Revenue’ within the meaning of the Origination Clause.” Munoz-Flores, 495 U.S. at 397-98, 110 S.Ct. 1964. Munoz-Flores thus tells us exactly how to interpret the Nebeker “other purposes” language and what it means. Id. Munoz-Flores unambiguously understood Nebeker ’s exception for “bills for other purposes which may incidentally create revenue” to apply to a carefully circumscribed set of cases.
A review of the Court’s older Origination Clause cases further illustrates the point. In Nebeker, for example, the law imposed a tax on banks. But the tax was not imposed to raise revenue for general governmental purposes; rather, the law imposed the tax “to meet the expenses attending the execution of the act” — that is, to fund the printing and distribution of America’s first treasury-backed currency. Nebeker, 167 U.S. at 202, 17 S.Ct. 766. The Supreme Court concluded that the law therefore fell outside the scope of the Origination Clause. The statute, the Court explained, had “no purpose” to raise funds “to be applied in meeting the expenses or obligations of the Government.” Nebeker, 167 U.S. at 203, 17 S.Ct. 766. Rather, all of the funds raised were designated by law to be used to pay the costs of printing and distributing currency.
In Millard, the Court considered a tax on property in the District of Columbia. The tax was designated by law solely to fund railroad infrastructure improvements in the District of Columbia. The Court held that the law imposing the tax was not subject to the Origination Clause. The Court found that the arrangement was “ ‘practically that of a contract’ ” between the Government and the railroad companies, in which the revenues were “but means to the purposes provided by the act.” Millard, 202 U.S. at 437, 26 S.Ct. 674.
Finally, in Munoz-Flores, the Court relied on Nebeker and Millard and again reached a similar conclusion. The Court concluded that a bill that fined convicted criminals and redistributed those funds to a Crime Victims Fund had “no purpose” to raise general revenues to be used for general governmental purposes. Munoz-Flores, 495 U.S. at 398, 110 S.Ct. 1964 (internal quotation marks omitted).
For the Court in Munoz-Flores, the essential point, as “in Nebeker and Millard,” was that the provision at issue raised money only “as part of a particular program to provide money for that program.” Id. at 399, 110 S.Ct. 1964 (emphases added). To reiterate, the Munoz-Flores Court summarized the critical Origination Clause principle as follows: A “statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a ‘Bil[l] for raising Revenue’ within the meaning of the Origination Clause.” Id. at 398, 110 S.Ct. 1964. In other words, under Munoz-Flores, the Origination Clause does apply to “a statute that raises revenue to support Government generally.” Id.
The Nebeker-Millard-Munoz-Flores principle applies only if the law in question designates that the revenues be used for a specific program. Importantly, the fact that a law raises revenue to be paid into the treasury to help generally offset the costs of a new program on the overall federal balance sheet has never been held to exempt the law from the Origination Clause. Otherwise, to take one example, a *1059 massive income tax increase imposed for the avowed purpose of offsetting the costs of new wartime efforts against al Qaeda and ISIS would be exempt from the Origination Clause. Under the panel opinion, such a tax law would not be subject to the Origination Clause. What the panel opinion misses is that many laws that create government programs also raise revenues, especially given strict congressional “pay-go” rales. But those laws remain subject to the Origination Clause. As noted above, that was the precise hypothetical Justice O’Connor raised in Munoz-Flores. She accurately called the Government’s contention that the Origination Clause would not apply in such a situation “pretty extreme.”
One scholar has summarized the Court’s ease law this way: If “a statute funds the general treasury instead of a specific program or service, it has a primary purpose of raising revenue. Alternatively, if the statute funds a specific activity or segment, it falls outside the scope of the Clause.” Rebecca M. Kysar, The ‘Shell Bill’ Game: Avoidance and the Origination Clause, 91 Wash. U.L.Rev. 659, 674 (2014). The Origination Clause case law, therefore, “fails to support judicial inquiry into Congress’s purpose in enacting a statute. Rather, the Court takes as a proxy that such purpose is non-revenue-raising when the structure of the statute earmarks revenues to fund a program it creates.” Id. at 676.
That said, Munoz-Flores had one wrinkle that is important to understand. The statutory scheme in Munoz-Flores provided that any contributions to the Crime Victims Fund in excess of $100 million a year would be transferred to the general treasury (and thus available for general governmental purposes), rather than redistributed to crime victims. The Court responded in two ways. The Court first swept that scenario aside as one that would rarely occur in practice. See Munoz-Flores, 495 U.S. at 398-99, 110 S.Ct. 1964. And the Court said that, in any event, any such leftover amount would not be “substantial” and thus was not an Origination Clause concern:
As in Nebeker and Millard, then, the special assessment provision was passed as part of a particular program to provide money for that program — the Crime Victims Fund. Although any excess was to go to the Treasury, there is no evidence that Congress contemplated the possibility of a substantial excess, nor did such an excess in fact materialize. Any revenue for the general Treasury that § 3013 creates is thus “incidenta[l]” to that provision’s primary purpose. •
Id. at 399, 110 S.Ct. 1964. Munoz-Flores therefore reinforced that the Origination Clause does apply to a bill that raises “substantial” revenue to be “paid into the General Treasury.” Id.
The narrow exception identified in Nebeker, Millard, and Munoz-Flores does not encompass the Affordable Care Act. The Affordable Care Act imposes a vast array of taxes and raises significant amounts of revenue that are paid into the general treasury and available for general governmental uses. The amount of revenue the Act raises is enormous — $473 billion over 10 years. The Affordable Care Act does not designate its tax revenues to be used only in particular programs. Under the relevant Supreme Court precedent, therefore, as well as the text and history of the Clause, the Affordable Care Act is a revenue-raising bill subject to the Origination Clause.
To be sure, some might say that the Nebeker-Millard-Munoz-Flores line of cases is itself inconsistent with the constitutional text because the laws in those cases did raise money, even though the *1060 money was designated by law for specific programs. The explanation for those cases seems straightforward: Here, as in other areas of constitutional law, the Supreme Court over time has carved out a narrow exception to (or limitation on) the general constitutional rule. The Court often does that in constitutional adjudication, sometimes when there is a compelling governmental interest in doing so, sometimes when history supports doing 'so, and sometimes when the exception is minimal, to take three common examples. See, e.g., Williams-Yulee v. Florida Bar, — U.S. -, 135 S.Ct. 1656, 191 L.Ed.2d 570 (2015).
The fundamental flaw in the panel opinion is that it transforms that heretofore narrow and rare exception to the Origination Clause into a broad new exemption. The broad new exemption created by the panel opinion presumably covers bills imposing regulatory taxes and many other bills that raise significant revenue — commonplace bills that all of the relevant players have previously understood to be subject to the Origination Clause. After all, if the panel opinion’s new exemption applies to a law that raises $Jp73 billion in revenue, it surely will cover lots of other bills that previously would have been thought to come within the Origination Clause.
Put simply, using the narrow Munoz-Flores exception to exempt the $473 billion Affordable Care Act from the Origination Clause is a textbook example of missing the forest for the trees.
To sum up so far: The Government and the panel opinion have gone astray in con-eluding that the Affordable Care Act is not a revenue-raising bill under the Origination Clause. The panel opinion is wrong on that point, and wrong in a way that, if followed, would degrade the House of Representative’s constitutional prerogative to originate revenue-raising bills. Sissel’s en banc petition says it well: “The panel’s ‘purposive approach’ alfbut guts the Origination Clause by effectively enabling the Senate to originate tax bills that might have some broader social purpose.” Petition for Rehearing En Banc at 2. In light of the importance of this issue to our constitutional structure and to the individual liberty protected by that structure, I would grant rehearing en banc to vacate the panel opinion’s flawed and consequential Origination Clause holding.[5]
Ill
Although the Affordable Care Act is a law for raising revenue and therefore was subject to the Origination Clause, the Act did in fact originate in the House, as required by that Clause. For that reason, I would reject Sissel’s Origination Clause claim.
To recap: On October 8, 2009, the House passed H.R. 3590, originally called the Service Members Home Ownership Tax Act of 2009. The Senate then amended that bill, substituting the text of what became the Affordable Care Act for the text that had been passed in the House.
Sissel contends that the Senate’s amendment substituting the Affordable Care Act for the text of the Service Members Home *1061 Ownership Tax Act “was not a lawful ‘amendment’ of H.R. 3590 as required by the Origination Clause” because it was not “ ‘germane to the subject matter of the [House] bill.’ ” Appellant’s Br. 21 (quoting Flint v. Stone Tracy Co., 220 U.S. 107, 143, 31 S.Ct. 342, 55 L.Ed. 389 (1911)).
Sissel’s claim is unavailing. The Origination Clause imposes no germaneness requirement on the Senate when it amends revenue-raising bills that originated in the House. That is apparent from the text, history, and precedent of the Origination Clause.[6]
To begin with, the germaneness requirement that Sissel urges is inconsistent with the text of the Origination Clause. The Origination Clause permits the Senate to “propose or concur with Amendments as on other Bills.” U.S. Const, art. I, § 7, cl. 1 (emphasis added). The text of the Origination Clause therefore grants the Senate as much authority to amend revenue bills as it grants the Senate to amend other bills. There is no general germaneness requirement when the Senate amends other House bills. It follows that there is no germaneness requirement when the Senate amends revenue bills. “As on other Bills” means “As on other Bills.”
The language permitting Senate amendment of revenue bills was critical, moreover, to the Constitutional Convention. In early English practice, revenue bills had'to originate in the House of Commons, and the House of Lords could not amend those revenue bills. By contrast, after Independence in 1776, several of the new American States departed from English practice by allowing the upper houses of their states’ legislatures to amend revenue bills. The Constitutional Convention followed the latter model and allowed Senate amendments to House-originated revenue bills. See 1 David K. Watson, The Constitution of the United States: Its History Application and Construction 342-43 (1910); S.Rep. No. 42146, at 3 (1872) (contrasting the “strietn” amendment limitations on the House of Lords with the expansive amendment power “our fathers provided” to the Senate).
The language permitting broad Senate amendments was . not an accident but instead was a deliberate and considered decision at Philadelphia. The delegates initially considered language that would not have allowed Senate amendment of revenue bills. 1 The Records of the Federal Convention of 1787, at 524-25 (July 5, *1062 1787) (Max Farrand ed., 1911). But after debate, the delegates provided for a broad Senate amendment power. One delegate, Elbridge Gerry, later lamented that the broad Senate amendment power weakened the force of the Clause. 3 id. at 265. During the Virginia ratification debates, William Grayson similarly complained that the Senate’s amendment power constituted a de facto power to originate revenue bills because it would allow the Senate to delete all the language of a House bill and substitute entirely new language. 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 377 (Jonathan Elliot ed.,,1881). No doubt Gerry and Grayson were right to perceive that the Senate’s broad amendment power would weaken the force of the Clause. But courts must respect the Constitution’s text. And the relevant text gives the Senate a broad amendment power.
Consistent with the Constitution’s text, moreover, Congress’s longstanding practice has been to permit Senate amendments of exactly the kind at issue here, in which the Senate essentially guts the House bill and replaces the House language with Senate language. See Thomas Jefferson, A Manual of Parliamentary Practice, For the Use of the Senate of the United States § 35, at 107 (Davis & Force 1820) (1801) (“Amendments may be made so as totally to alter the nature of the proposition,” and entirely new propositions can be “ingrafted by way of amendment on the words ‘Be it enacted.’ ”); S.Rep. No. 42-146, at 3 (When “a bill for raising revenue has originated in the House, no limitation is placed by the Constitution upon the power of the Senate to amend it____The exclusive prerogative of the House of Representatives in relation to such bills is simply to originate them.”).
That historical practice has continued to the present day. There are many modern examples of so-called “gut and replace” legislation. See, e.g., American Taxpayer Relief Act of 2012, Pub.L. No. 112-240,126 Stat. 2313 (2013); Emergency Economic Stabilization Act of 2008, Pub.L. No. 110-343, 122 Stat. 3765 (2008); Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085 (1986).
That historical practice matters. See National Labor Relations Board v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 2559, 189 L.Ed.2d 538 (2014) (historical practice “ ‘is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning’ ”) (quoting The Pocket Veto Case, 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929)).
Most importantly for us as a lower court, the relevant Supreme Court case law forecloses the germaneness requirement advanced by Sissel. In Rainey v. United States, 232 U.S. 310, 34 S.Ct. 429, 58 L.Ed. 617 (1914), the Supreme Court concluded that there was no germaneness requirement on Senate amendments to revenue bills. In that case, the Senate had amended a House-originated tariff bill to include a new tax on foreign-made yachts. Id. at 315-17, 34 S.Ct. 429. The Court stated: “Having become an enrolled and duly authenticated Act of Congress, it is not for this Court to determine whether the amendment was or was not outside the purposes of the original bill.” Id. at 317, 34 S.Ct. 429.[7]
*1063 Rainey is squarely on point and has never been overruled. That decision resolves the germaneness issue in this case in favor of the Government.
To overcome Rainey, Sissel cites a pre-Rainey case, Flint v. Stone Tracy Co., 220 U.S. 107, 143, 31 S.Ct. 342, 55 L.Ed. 389 (1911). In upholding the law there against an Origination Clause challenge, Flint noted that the amendment enacted in the Senate “was germane to the subject-matter of the bill and not beyond the power of the Senate to propose.” Id. But the Flint Court did not draw any legal conclusions from that description of the bill. Therefore, Flint may not properly be read to impose a judicially enforceable germaneness requirement, especially in light of Rainey’s later rejection of just such a requirement.
In short, notwithstanding the Senate’s amendment, the Affordable Care Act originated in the House.
IV
Before closing, a few final comments:
Some understandably say that allowing the Senate to exercise such a broad amendment power over revenue-raising bills greatly diminishes the force of the Clause and makes the Origination Clause unimportant. There are two responses to that observation. First, as judges, we have no choice but to respect the text, history, and precedent of the Clause, which plainly grant the Senate a broad amendment power. Courts do not have authority to redesign the constitutional structure as we might like it. To make such structural changes, there is a constitutional amendment process — one that has been utilized to make major changes to the original design. Cf. U.S. Const, amends. 12, 14, 17, 20, 22, 25; see generally Arizona State Legislature v. Arizona Independent Redistricting Commission, — U.S. -, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting); Akhil Reed Amar, America’s Constitution: A Biography 285-99, 313-463 (2005). Second, although the Senate’s amendment power no doubt significantly weakens the potential force of the House’s origination power, the House’s first-mover authority still gives it substantial control over tax legislation, as Madison explained and as history has borne out. In the real world, the House’s exclusive origination power matters. See generally Adrian Vermeule, The Constitutional Law of Congressional Procedure, 71 U. Chi. L.Rev. 361, 424-25 (2004). To say that the House’s origination power is less than it could have been is not to say that the House’s origination power is meaningless.
Some might respond, however, that even accepting the general importance of the Origination Clause, the panel opinion is- no big deal because the House of Representatives has the power to protect itself from the consequences. It is true that the House may go beyond the text of the Origination Clause and, as a matter of its own rulemaking powers, require even non-revenue bills to originate in the House — or else not pass the bills. Article I, Section 5, Clause 2 of the Constitution guarantees that “Each House may determine the Rules of its Proceedings.” The House and Senate of course may not disregard the Origination Clause or subtract from its requirements. But as part of their own rules or practices, they may insist on further requirements beyond whát the Origination Clause demands.
But there are at least three problems with relying on the House’s self-help power as a basis for downplaying the consequences of the panel opinion.
First, that suggestion is almost akin to saying that the Origination Clause is a political question that Congress can sort out without judicial intrusion. But the *1064 Supreme Court concluded otherwise in Munoz-Flores. See United States v. Munoz-Flores, 495 U.S. 385, 396, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). There, as the Court noted, the Government argued “that the House has the power to protect its institutional interests by refusing to pass a bill if it believes that the Origination Clause has been violated.” Id. at 392, 110 S.Ct. 1964. The Court rejected the Government’s political question argument. The Court explained that judicial policing of the Origination Clause furthers individual liberty by safeguarding the people from excessive taxation. See id. at 394, 110 S.Ct. 1964. In separation of powers cases, the Court does not just defer to the political branches. See generally Zivotofsky v. Kerry, — U.S. -, 135 S.Ct. 2076, 192 L.Ed.2d 83 (2015); Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803). It is not acceptable for courts to outsource preservation of the constitutional structure to the political branches.
Second, getting it right as a court is important because the House (now or in the future) could just roll over and acquiesce to the flawed panel opinion. But wouldn’t such House acquiescence be acceptable from a separation of powers perspective? Not to the Supreme Court. The Court has made clear that even acquiescence by a political branch in its own unconstitutionally diminished power still does not justify judicial tolerance of a separation of powers violation. Landmark cases such as Clinton v. City of New York, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), and Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010), illustrate the point. As those cases explain, the constitutional structure is not merely a matter of etiquette but protects individual liberty. In justiciable cases, courts must enforce the Constitution’s structural protections even when the affected Branch does not. Cf. Free Enterprise Fund, 561 U.S. at 497, 130 S.Ct. 3138 (“Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment.”) (citation and internal quotation marks omitted).
Third, judicial decisions — such as the panel opinion in this case — commonly establish a baseline that affects congressional rules, negotiations, and ultimately legislative results, as those who have labored on the Hill can readily attest. So a flawed judicial decision will often influence the give-and-take of congressional practice. To say that the House can work around the flawed panel opinion is to ignore the reality of how a flawed judicial decision can affect the negotiations by which that corrective process occurs.
To read my opinion so far, you might wonder whether I think the world will end not in fire, or in ice, or in a bankruptcy court, but in an Origination Clause violation.[8] I of course realize there are more important constitutional issues. This case is not Marbury v. Madison redux. But the case is still quite important.
Although the panel opinion reached the correct bottom-line result, the panel opinion’s interpretation of the Origination Clause is incorrect, in my respectful view. The panel opinion alters the longstanding balance of power between the House and *1065 Senate, and ultimately affects individual liberty. We should correct the panel opinion’s error now rather than let it linger and metastasize. I would grant rehearing en banc, vacate the panel opinion, and rule for the Government on the ground that the Affordable Care Act originated in the House and thereby complied with the Origination Clause.

. To be sure, a potentially challenging remedial or severability question arises if a law is found to violate the Origination Clause: Should a court invalidate the whole law or strike only those revenue-raising provisions that originated in the Senate? We need not address that question in this case because the Act did originate in the House, as explained below.

. That revenue number represents the CBO's revenue projection -for only the Affordable Care Act, H.R. 3590, not for that Act in combination with the Health Care and Education Reconciliation Act of 2010, H.R. 4872. The Reconciliation Act was passed shortly after the Affordable Care Act and made certain corrections to it. Considered together, the two bills were projected to raise $525 billion in revenue over 10 years. See Selected CBO Publications Related to Health Care Legislation, 2009-2010, at 21.

. Madison was not a supporter of the Origination Clause, as the panel concurrence notes. But that is in part because he wanted proportional representation in the Senate. The Great Compromise eliminated proportional representation in the Senate, with the Origination Clause being some recompense to the large States for agreeing to the Compromise. Madison saw the Origination Clause as weak compensation for losing proportional representation in the Senate. Madison also pointed out several flaws in various proposed versions of the Clause, including the problem of trying to identify a primary purpose of legislation. The Convention agreed with him on that point. Contrary to the suggestion in the panel concurrence, Madison’s prescient and successful objection to the “purpose of revenue” language cannot be deemed irrelevant simply because he also had other concerns about the Clause.

. The panel concurrence says that delegates to the Convention "expressed no opposition” to the "narrowing” proposed by Randolph. Panel Concurrence at 19. That is incorrect. Madison’s statement objected to the precise words that the concurrence now contends were incorporated sub silentio into the final version of the Clause. And the vote was 7 to 4 in Madison's favor.

. As explained above, the Origination Clause inquiry focuses on the entire law. If any provision of the law raises revenue for general governmental purposes, then the Origination Clause applies. But even if the relevant Origination Clause inquiry focused only on a particular provision of the law, rather than on the law as a whole, the tax on individuals who do not have insurance (known as the individual mandate) alone was forecast to raise massive amounts of revenue, approximately $4 billion a year by 2017. National Federation of Independent Business, 132 S.Ct. at 2594. Therefore, the individual mandate itself is a revenue-raising provision.

. H.R. 3590 modified the first-time homebuyer tax credit for service members, increased the pre-payment amount for corporate taxes, and increased the tax penalty for failing to file certain corporate tax returns. H.R. 3590 (as passed by the House on October 8, 2009). The Joint Committee on Taxation estimated that several provisions of H.R. 3590 would raise significant revenue. See Joint Committee on Taxation, Estimated Revenue Effects of H.R. 3590, the "Service Members Home Ownership Tax Act of 2009” (Oct. 6, 2009). As noted above, see pages 19-20, if a bill raises revenue, the Origination Clause applies, even if the overall bill is deficit neutral. So it was in the original H.R. 3590. But what happens when the original House-passed bill does not contain any revenue-raising provisions at all? Can the Senate amend such a bill to add revenue-raising provisions? Under the prevailing view, the original House-passed bill must itself contain revenue-raising provisions in order for the Senate to permissibly add revenue-raising provisions through its amendment process. See James V. Saturno, Congressional Research Service, The Origination Clause of the U.S. Constitution: Interpretation and Enforcement, at 6 (March 15, 2011). But this case does not require a definitive judicial answer to that question because the original House bill here in fact contained revenue-raising provisions. One related note: In practice, Congress seems to broadly apply the Origination Clause to all revenue-affecting bills because of the potential difficulty of determining whether a tax bill raises or reduces revenues. Id. at 4. But the House bill here was clearly revenue-raising, so we need not explore that issue further.

. If Senate rules imposed a germaneness requirement for all amendments to legislation, would such a germaneness requirement then be enforceable under the Origination Clause, notwithstanding Rainey, given that the Clause says that the Senate may amend revenue bills "as on other Bills"? We need not confront that question here because there is no such Senate rule imposing a general germaneness requirement for amendments.

. See Wellness International Network, Ltd. v. Sharif, - U.S. -, 135 S.Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) (“To hear the principal dissent tell it, the world will end not in fire, or ice, but in a bankruptcy court.”).